**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DORIS BANKS, CANDY CAPORALE, BRUCE DAVIS, GENE SULLENBERGER, and CHRISTINE WOOTTEN, for themselves and on behalf of all others similarly situated, | |
| Plaintiffs, | C.A. NO. 19-1672-MN-JLH |
| v. | JURY TRIAL DEMANDED |
| E. I. DU PONT DE NEMOURS AND COMPANY, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), ATOTECH USA, LLC, MACDERMID, INC., PROCINO PLATING, INC., a/k/a PROCINO ENTERPRISES, a/k/a PROCINO, and BLADES DEVELOPMENT LLC, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs, individually and on behalf of a class of other people similarly situated, state as follows for this First Amended Class Action Complaint against Defendants E. I. DU PONT DE NEMOURS AND COMPANY, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), ATOTECH USA, LLC, MACDERMID, INC., PROCINO PLATING, INC., and BLADES DEVELOPMENT LLC (collectively, "Defendants").

**INTRODUCTION**

1.     The Town of Blades is located in Sussex County, Delaware.

2.     Since the early 1980s, the operators of two companies in the Town of Blades used products containing Perfluorooctanoic Acid ("PFOA") and Perfluoroctane Sulfonate ("PFOS") in hard chrome plating processes and to manufacture commercial and/or consumer nonstick

1

cookware, and carelessly discharged PFOA and PFOS into the environment, contaminating the ground water and water supply of the Town of Blades.

3.     Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a result of exposure to the introduction of PFOA, PFOS and other toxic substances into the drinking water of the Town of Blades.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### PFOA and PFOS Background

4.     PFOA (also known as C8 or perfluorooctanoate) and PFOS are man-made, manufactured chemicals not found in nature that belong to a group of fluorine-containing chemicals called perfluorinated chemicals (PFCs).  These chemicals were and are used to make household and commercial products that resist heat and chemical reactions, repel oil, stains, grease and water.

5.     In 1947, the Minnesota Mining and Manufacturing Company ("3M") began producing PFOA via electrochemical fluorination. 3M began manufacturing PFOS and related molecules no later than 1948.

6.     Over the years, a number of companies, including but not limited to, E. I. Du Pont de Nemours and Company ("DuPont"), have manufactured PFOA and PFOS within the United States.

7.     PFOA and PFOS are extremely stable fluorine-containing chemicals that do not breakdown in the environment.  They are used in the production of commercial and consumer nonstick cookware and are utilized in the hard chrome plating process.  Upon information and belief, mist and fume suppressants, fluorosurfactants, wetting agents and emulsifiers containing PFOA and PFOS – including but not limited to Fumetrol-140, Barrett Snap, and cadmium

fluoroborate – were used in the hard chrome plating and nonstick cookware manufacturing processes conducted by the Procino Enterprises ("Procino") and Peninsula Plating ("Peninsula") in the Town of Blades.

8.      PFOA and PFOS gets into the environment from industrial facilities that make PFOA and PFOS or use PFOA and PFOS to make other products.  It also enters the environment when released from PFOA- and PFOS-containing consumer products during their use, storage, and disposal.

9.      PFOA and PFOS can remain in the environment, particularly in water, for many years.  PFOA and PFOS can move through soil and into groundwater, or be carried in air.

10.      Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, high cholesterol levels, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

11.      These injuries can arise months or years after exposure to PFOA and/or PFOS.

12.      PFOA's and PFOS's extreme persistence in the environment and its toxicity, mobility and bioaccumulation potential, pose potential adverse effects to human health and the environment.

### **Background of PFCs**

13.      PFOA (also known as C8 or perfluorooctanoate) and PFOS are man-made, manufactured chemicals not found in nature that belong to a group of fluorine-containing chemicals called perfluorinated chemicals (PFCs). These chemicals were and are used to make household and commercial products that resist heat and chemical reactions, and repel oil, stains,

grease, and water. They are also used as fluorosurfactants, mist and fume suppressants, and wetting agents used in electroplating processes.

14. In 1947, the Minnesota Mining and Manufacturing Company (3M) began producing PFOA via electrochemical fluorination. 3M is the inventor and original manufacturer of PFOA having begun manufacturing the chemical in approximately 1947 at its Cottage Grove plant in Minnesota. 3M began producing PFOS as early as 1948. It ceased manufacturing PFOA and PFOS in or about the year 2000.

15. Defendant DuPont began using PFOA (also referred to as C-8) in dispersion polymerization in the manufacture of fluoropolymers at its Washington Works plant in West Virginia in the 1950s.

16. DuPont began manufacturing PFOA after defendant 3M chose to stop making the chemical in 2000 and DuPont then continued to manufacture PFOA and use it in its manufacturing processes after 2000. Defendant DuPont also sold PFOA to other manufacturers of polytetrafluoroethylene (PTFE) and fluorinated ethylene propylene (FEP)[1] dispersions once it took over manufacturing the chemical from 3M after 2000.

17. Atotech USA, LLC ("Atotech") is a surface-finishing solutions provider, and manufactured, sold and distributed mist and fume suppressants, fluorosurfactants, wetting agents and emulsifiers containing PFOA and PFOS including Fumetrol-140, a fume suppressant which contained PFCs.

18. MacDermid, Inc. ("MacDermid") is a chemical products provider, and manufactured, sold and distributed mist and fume suppressants, fluorosurfactants, wetting agents

---

[1] References to PTFE dispersions are intended to also include FEP dispersions and other PFOA-containing products manufactured by defendants DuPont and 3M.

and emulsifiers containing PFOA and PFOS including Barrett Snap, a wetting agent which contained PFCs.

19.     Upon information and belief, PFOS and PFOA manufactured by 3M and DuPont was used in the production of mist and fume suppressants, fluorosurfactants, wetting agents and emulsifiers containing PFOA and PFOS ("PFC-Containing Products") including Fumetrol-140, Barrett Snap and cadmium fluoroborate.  3M and DuPontalso manufactured, sold and distributed PFC-Containing Products.

20.     3M, DuPont, Atotech, and MacDermid manufactured, marketed, and sold "PFC-Containing Products" – including but not limited to Fumetrol-140, Barrett Snap, and cadmium fluoroborate – to companies such as Procino and Peninsula, for use in their hard chrome plating and commercial and consumer nonstick cookware manufacturing processes.

21.     3M, DuPont, Atotech, and MacDermid marked and sold PFC-Containing Products with knowledge that large quantities of these products, containing toxic PFCs, would be stored, used, disposed and discharged into the air, ground, water, groundwater, and environment.

22.     3M, DuPont, Atotech, and MacDermid repeatedly assured Plaintiffs, Class Members, purchasers of its PFC-Containing Products, and the public that their PFC-Containing Products were safe.

23.     PFOA and PFOS were once widely used in nonstick cookware, in surface coatings for stain-resistant carpets and fabric, and in paper and cardboard food packaging (such as microwave popcorn bags and fast food containers).  PFOA and PFOS were also used in the electroplating processes as fluorosurfactants, mist and fume suppressants, wetting agents, and emulsifiers.

24.     PFOA and PFOS are fluorine-containing chemical that are primarily used in the production of fluoropolymers such as poly-tetra-fluoro-ethylene ("PTFE"). Upon information and belief, PFOA and PFOS were components of the PFC-Containing Products that were used at the Procino and Peninsula facilities in the Town of Blades.

25.     PFOA and PFOS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney and liver.

26.     Defendant DuPont had received inquiries regarding the toxicity of PFOA as early as 1954 and began to be concerned about its toxicity.

27.     In or about 1961 toxicologists working for defendant DuPont concluded that PFOA was toxic. Its toxicology section chief stated it should be "handled with extreme care." DuPont researchers also found that exposure to PFOA causes an increase in the size of the livers in rats and rabbits. In 1962 the same effect was discovered by DuPont scientists when PFOA was ingested by dogs. Internal documents from defendant 3M show that company scientists had been aware of the health risks of PFOA as early as the 1960s.

28.     As far back as 1962, 3M's own employees recommended 3M incinerate its PFC waste so that "wet waste material will not have an opportunity to seep into the soil." However, upon information and belief, 3M did not make that same recommendation to purchasers of its products, Plaintiffs, Class Members or the public. Instead, upon information and belief, 3M hid its Geology Department's recommendations from purchasers of its products, Plaintiffs, Class Members and the public. 3M did this because, as noted in an internal presentation written on or about December 14, 1995, "PRIMARILY BECAUSE OF THE PERSISTENCE OF FLUORO-CHEMICALS, ENVIRONMENTAL, HEALTH, SAFETY AND REGULATORY ISSUES AND TRENDS THREATEN TO LIMIT OUR BUSINESS."

29.     In 1970, defendant DuPont became aware that a large group of company foremen and salesmen at its Washington Works facility in West Virginia where Teflon® manufacturing took place, had higher incidence rates of myocardial infarction, cerebrovascular disease, diabetes mellitus and cancer than its high level executives at the facility who were not involved directly in manufacturing operations.

30.     In 1976 researchers from the University of Rochester, New York published a report that showed widespread contamination of human tissues with organo-fluorine compounds (organic compounds that contain the carbon-fluorine bond) which likely derived from commercial sources such as PFOA.  The authors contacted defendant 3M questioning whether its consumer products containing these compounds could be the source.  J.D. LaZerte of 3M advised W.S. Guy, one of the researchers on the project, "not to speculate" on the source of the organo-fluorine compounds found in human tissues and, upon information and belief, 3M took no further action to investigate this issue.

31.     By 1978, defendant 3M had found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

32.     When defendant DuPont learned of these elevated levels in 3M workers, it too began an internal review to determine its workers' C-8 (PFOA) concentrations and documented high concentrations of PFOA in the blood of its factory workers at its Washington Works plant in West Virginia, showing that PFOA bioaccumulates and is not easily removed from the body.

33.     In 1978, Bruce Karrh, M.D., defendant DuPont's Corporate Medical Director, published an article in a professional journal stating: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. . . [A] company should disclose health-hazard information.  It should be candid, and lay all the facts on the table.

This is the only responsible and ethical way to go.  This approach is the correct one, of course and it is the way we try to proceed at DuPont."

34.    By September of 1978 Defendant DuPont had reviewed medical records of 11 operators and 18 laboratory workers with long-term exposure to PFOA and found that more of them than anticipated had abnormal liver function tests (elevated liver enzymes in their blood serum).

35.    In the late 1970s defendant 3M consulted with Dr. Harold C. Hodge of the University of Rochester.  At a meeting in 1978, Dr. Hodge told 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls.  "There appears to be indications of liver change from the physical examination results.  In terms of indicators of liver disorder, there are [sic] a higher percentage of Chemolite [one 3M facility] than at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is correspondingly higher."  Dr. Hodge indicated to 3M at this time that a potential hazard was present regarding organo-fluorine chemical exposure to its workers.

36.    A joint meeting was held in 1979 between defendant 3M's fluorochemical exposure committee and defendant DuPont's Eugene Berman and several of his DuPont colleagues.  Both companies' representatives agreed that since there were no *established* adverse health effects associated with the findings of accumulated fluorochemicals in the blood of workers at the two companies there was no reason to provide an 8E notification under TSCA to the Environmental Protection Agency regarding these findings.  Minutes from the meeting indicate that a discussion transpired between the two companies as to whether they would make any efforts to seek evidence of a possible association between worker blood levels and illness: "DuPont was asked if they had carried out any chronic studies on fluorochemicals in

the past and if they planned any in the future.   In both cases the answer was negative. Fluorochemicals have a low priority in their chronic testing program.  They would not carry out such studies unless they were forced to by regulations."

37.    In 1979, Defendant DuPont learned that PFOA caused metabolic abnormalities, including uncoupling of oxidative phosphorylation in rat liver mitochondria that were oxidizing succinate.   It also learned that PFOA seemed to alter the immunochemical reaction of bovine (cow) serum albumin.  It also was aware at that time that: 1) PFOA caused liver enlargement in rats and death at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and; 3) inhaled doses in rats for only four hours could cause liver enlargement and corneal opacity.

38.    Based upon the adverse health effects of PFOA on laboratory animals, in 1979 defendant DuPont established a provisional PFOA acceptable exposure level for its employees of $0.01 \text{ mg/m}^3$ in air based upon an 8-hour time-weighted average exposure.

39.    In 1979 Defendant DuPont found increased PFOA levels in the blood of eight workers who worked in the FEP polymerization and PTFE dispersion polymerization processes, with the average blood level for PFOA among the eight workers being 8.2 ppm (8,200 ppb).

40.    In 1979 Defendant DuPont was aware that blood test results of its Washington Works employees from 1978 showed that organic fluoride levels were associated with increases in SGOT levels in blood serum.   SGOT (now more commonly referred to as AST) is a liver enzyme which when found at increased levels in blood serum is a sign of possible liver damage.

41.    In 1979, Defendant DuPont was aware "compound-related effects" (effects related to PFOA) were observed in both Rhesus monkeys and Charles River CD rats, but that "monkeys were more severely affected of the two."   It learned that "the data on monkeys suggested

increased incidences of chronic interstitial nephritis [kidney damage], hyperkeratosis in the skin and a slight increase in skeletal muscle atrophy … Similarly, the data on rats suggest hepatocellular necrosis [liver damage], sinusoidal liver congestion and the presence of yellow-brown pigment in the epithelium of the convoluted tubules of the kidney."

42.    By 1979 Defendant DuPont was aware that a 90-day oral study in Rhesus monkeys had been administered at dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

43.    Early PFOA toxicology studies commissioned by defendant 3M were summarized in 1980 and the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until 2000, the year defendant 3M decided to stop manufacturing PFOA.

44.    In 1980 PFOA animal toxicity studies were published by Griffith and Long in the JAIHA.

45.    By 1980, defendant DuPont had internally confirmed that PFOA "is toxic," "people accumulate" the chemical in their bodies after exposure and "continued exposure is not tolerable." At this same time defendant DuPont documented that sixteen of its workers had PFOA blood serum levels of between 4.97 ppm and 21.69 ppm (4,970 ppb and 21,690 ppb).

10

46.     In 1980 DuPont was aware that the rate of first time myocardial infarctions (heart attacks) in company foreman at its Washington Works facility was almost double what would have been expected.

47.     In materials from a C-8 Communications meeting, dated July 31, 1980, D.E. Steiner, an employee of defendant DuPont, stated: "After 25 years of handling C-8, we see no damage among workers.  However the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

48.     By 1981, defendant DuPont was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus.   PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

49.     By 1981 defendant 3M was aware that PFOA ingestion caused birth defects in rats. Acting on this information defendant DuPont surveyed children born to workers of its Teflon Division and found birth defects in two of seven children born to PFOA exposed workers, both of whom had eye defects.

50.     An experimental study conducted by defendant 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA.   A total of three teratology studies were carried out, all of them finding lens abnormalities in exposed animals.   In March of 1981, defendant 3M informed defendant DuPont of the rat study.  DuPont then removed all female employees from PFOA exposed jobs, but did not inform them of the reason for their transfer.

51.     By the early 1980's Defendants DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA that Defendants were not sharing publicly.

52.     In 1982, Defendant DuPont calculated that approximately 40 percent of the PFOA vapor inhaled was retained in the blood of human males.

53.     A cross-sectional study of worker health at 3M's Chemolite plant in Cottage Grove, Minnesota was summarized by a 3M medical officer in 1982 as showing a high prevalence of high blood pressure and elevation of cholesterol.   No apparent effort was made to compare the incidence of these conditions to PFOA or PFOS blood levels and the authors concluded that this observation was caused by worker lifestyle, not occupational exposures.

54.     On November 23, 1982, Defendant DuPont's Medical Director, Bruce Karrh, MD, wrote in an internal memorandum: a) "Our knowledge of the product health effects of long-term exposure to low levels of C-8 is quite limited"; b) "C-8 is retained in the blood for a long time, creating concern in other areas such as blood donations, etc."; and c) "All employees, not just Teflon area workers, are exposed."

55.     By September of 1984 defendant 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

56.     Thereafter, defendant 3M decided to search to see if it could find any blood samples among its workers that were free of organo-fluorine compounds.  When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of

non- industrial sources of organic fluorine in normal human blood." 3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources, but was unable to find any data to support this hypothesis.

57.    By June 14, 1984 defendant DuPont was aware from analysis of blood testing of former Teflon Division employees that the average biological half-life of PFOA in human blood was approximately 2.4 years, but with considerable variability between individuals.

58.    In 1984 defendant DuPont was aware that male operators in the Teflon division that had worked there for many years had complained about difficulty in achieving pregnancy with their wives.

59.    By 1986 defendant DuPont was aware of a cancer morbidity study among its Washington Works employees that showed male hourly wage workers had an incidence of bladder cancer deaths at more than double what would have been expected.

60.    By 1987 defendant DuPont was aware through a study conducted of its Chamber Works plant in Deepwater, New Jersey, where fluorochemicals were used, that there were increases above expected rates of death from female breast cancer, bladder cancer, Hodgkin's disease, lung cancer, urinary cancers in men and cirrhosis of the liver in women.

61.    On June 12, 1987, H.A. Smith, of the Safety, Energy & Environmental Affairs office of defendant DuPont's Manufacturing Division made a request to DuPont's Haskell Laboratory that they establish an acceptable level of PFOA in the blood and an acceptable level of PFOA in drinking water.

62.    By 1988 defendant DuPont was aware that PFOA was associated with increased rates of carcinogenicity in rats, including testicular cancer.

63.     On March 9, 1988 defendant DuPont first recommended a drinking water limit for PFOA of 1 ug/L (ppb).  This guideline was adopted by DuPont in June of 1991.

64.     In 1989 a study by defendant DuPont of cancer incidence among its Washington Works employees detected an increased incidence of leukemia, buccal cavity and pharynx cancer, kidney and other urinary cancers, including bladder cancer and multiple myeloma.

65.     By 1989, defendant DuPont was aware that there were increases in other cancers at its Chamber Works facility as well, including pancreatic, lung, kidney and bladder cancers and Hodgkin's disease.

66.     An internal DuPont memo dated December 14, 1989, entitled "Washington Works: Cancer Incidence and Overall Mortality Rates" indicates that among Washington Works employees there was an increased incidence over expected of testicular cancer, kidney cancer and other urinary cancers.

67.     By 1990 defendant DuPont was aware that among its Chamber Works employees there was a statistically significant excess of deaths due to urinary cancers, a statistically significant increased incidence of bladder cancer in male employees, a statistically significant increase in mortality from cancer of the digestive organs among female employees and female employees continued to have a statistically significant elevation in the incidence of cirrhosis of the liver.

68.     A 1990 DuPont internal industrial hygiene data review demonstrated a correlation between PFOA levels in the air and PFOA blood levels in workers who inhaled contaminated air.  It was found that levels in blood were an order of magnitude or more higher than the levels in the air, which demonstrated that PFOA bioaccumulated inside the human body.

14

69.     In a DuPont report dated April 12, 1990 entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma" by Mark Hurtt and Jon Cook of DuPont's Haskell Laboratory, which reviewed data derived from a 3M animal study, the authors concluded that the induction of Leydig cell adenoma (testicular tumors) related to PFOA exposure was likely to be hormonally mediated.

70.     By October of 1990 defendant DuPont learned that PFOA induced a dose-related decrease in serum testosterone, which appeared to document a direct effect of PFOA on the testes.

71.     On March 15, 1991, Wayne H. Martin of defendant DuPont's regulatory affairs department sent a memo that reported on a meeting at which he and other DuPont employees decided that "A warning of potential C-8 hazards (especially from condensate) should be included in MSDSs for all products in which C-8 concentration is 0.1% or more."  It also indicated that all other "product literature which contains safety or health warnings should be revised to be consistent with MSDS."

72.     In October of 1991 an internal proposal to conduct a cross-sectional study of liver enzyme levels among Washington Works employees with potential exposure to PFOA was rejected by defendant DuPont's management.  In notes from a meeting when this proposed study was considered, a DuPont employee wrote: "Do the study after we are sued."

73.     In the unpublished 1992 thesis of Frank Gilliland, MD who studied the clinical pathology parameters of 111 male workers at defendant 3M's Chemolite plant in Cottage Grove, MN, Dr. Gilliland found a positive correlation between PFOA exposure measured as serum total organic fluorine and estradiol (an adverse effect) and a negative

correlation with free testosterone (also an adverse effect) with this association being stronger in older men.   Dr. Gilliland concluded that PFOA may affect male reproductive hormones.

74.    Dr. Gilliland's 1992 unpublished thesis from his 3M worker study also showed thyroid effects in 3M production workers that were associated with organo-fluorine concentrations in worker blood serum.  A positive correlation was seen between organic fluorine and the thyroid stimulating hormone in serum, a sign of thyroid deficiency.

75.    An internal document from defendant DuPont acknowledged that at doses of 300 ppm PFOA caused statistically significant increases in adenomas and carcinoma of the liver, pancreas and Leydig cell adenomas in the testis.  Thus, by 1993, DuPont was aware of two animal studies that found that PFOA caused testicular cancer and DuPont knew that PFOA caused cancer at three different anatomical sites among laboratory animals exposed to PFOA.

76.    By 1993 defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

77.    When defendant 3M discussed DuPont's results on cancer in male rats with colleagues from the UK company ICI in 1995, the latter strongly espoused that PFOA should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but 3M representatives disagreed.

78.    By 1996 defendant DuPont was informed that testing linked PFOA to damage to DNA.

79.    In or about 1996 defendants DuPont and 3M jointly commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical.  By November of 1998 defendants DuPont and 3M were aware that monkeys in this study were suffering

from severe health effects.  By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in non-human primates.

80.     As of January of 1997, researchers at defendant DuPont were aware of a hormonally-mediated mechanism for the Leydig cell tumors in rat testes.  In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at the DuPont Haskell Laboratory wrote:   "The studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates  serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation….   The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out.  However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system."

81.     A paper published in 1997 by John C. Cook of defendant DuPont together with Eric D. Clegg, concluded: "Occurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]… it should be assumed that humans are potentially susceptible."

82.     In 1999 Dr. Richard Purdy of defendant 3M wrote to his 3M colleagues, Drs. John Buttenhoff and Andrew Seacat that his calculations showed that a "general population member

with [PFOA levels of] 70 ppb (in one's blood) could have 36 times more in his liver" due to life-time accumulation.

83.    In April of 2000 defendant DuPont rejected its occupational health official's recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

84.    In or about 2000 the United States Environmental Protection Agency notified defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals manufactured by this defendant.  Shortly thereafter defendant 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA.   Two of the reasons for defendant 3M's decision were PFOA's bio-persistence and toxicity.

85.    In October of 2001 Paul M. Hinderliter, Ph.D. and Gary W. Jepson, Ph.D. of the DuPont Haskell Laboratory, drafted a paper entitled: A Simple, Conservative Compartmental Model to Relate Ammonium Perfluorooctanoate (PFOA) Exposure to Estimates of Perfluorooctanoate (PFOA) Blood Levels in Humans."  The paper described calculations which showed that ingestion of 1 part per billion of PFOA in drinking water corresponded to human PFOA blood levels 300 times higher.

86.    In March of 2002 a defendant DuPont website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical. 3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

87.     Before 2003, only one commercial laboratory in the United States had the capacity to detect perfluorocarbons such as PFOA in blood.  DuPont's contract with that laboratory prohibited it from testing PFCs for other entities without the consent of DuPont.

88.     In 2003 defendant 3M conducted a mortality study of its workers exposed to PFOS, a chemical closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

89.     A mortality registry kept by defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

90.     In 2006, the U.S. EPA reached a settlement agreement with defendant 3M to resolve 3M's alleged reporting violations under the Toxic Substances Control Act regarding its fluorochemicals.  The agreement did not require 3M to admit the violations, but the company agreed to pay a penalty in excess of $1.5 Million Dollars for 244 separate alleged violations.

91.     In 2006, eight major PFOA manufacturers agreed to participate in the U.S. Environmental Protection Agency's ("EPA") PFOA Stewardship Program.  The program that included eight major perfluoroalkyl manufacturing companies, including defendants DuPont and 3M.  The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95%, no later than 2010.

92.     In 2009 defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

93.    As of May 2016, the EPA has issued Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS.[2]  The EPA identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure at 70 parts per trillion. While health advisories are non-regulatory, they reflect the EPA's assessment of the best available peer-reviewed science.

94.    On at least January 13, 1999 and as recently as December 2017, 3M continued to assure purchasers of its products, Plaintiffs, Class Members, and the public that "PFOS and PFOA do not present health risks at levels they are typically found in the environment or in human blood" and that even "production workers who were exposed to these chemicals at levels significantly higher than those in the general population – often over an extended period of time…show no adverse health effects."

95.    Upon information and belief, Atotech and MacDermid knew of these studies, reports and publications, and therefore knew of the risks that PFOA and PFOS posed to human health.

96.    PFOA gets into the environment from industrial facilities that make PFOA or use PFOA to make other products.  It also enters the environment when released from PFOA-containing consumer products during their use, storage and disposal.

97.    PFOA can remain in the environment, particularly in water, for many years. PFOA can move through soil and into groundwater, or be carried in air.

98.    Human studies show associations between increased PFOA levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, high cholesterol levels, increased risk of high blood pressure, changes in thyroid hormone, ulcerative

---

[2] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctanoate Sulfonate, 81 Fed. Reg. 101 (May 25, 2016)

colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

99.     These injuries can arise months or years after exposure to PFOA.

100.    PFOA's extreme persistence in the environment and its toxicity, mobility and bioaccumulation potential, pose potential adverse effects to human health and the environment.

### Knowledge of PFOA Environmental Contamination

101.    In 1966 defendant DuPont became aware that perfluorochemicals including PFOA move rapidly in groundwater and migrate into nearby bodies of water.

102.    By August 31, 1966 defendant DuPont became aware that, without pretreatment, a small amount of perfluorocarboxylic acid (the class of pefluorochemicals to which PFOA belongs) dispersing agent, deposited in a landfill would be leached into the groundwater.

103.    By May 13, 1975, defendant DuPont employees in a memo entitled "Investigation of Current Telflon® Waste Disposal" stated: "The problems with disposing of 'Teflon' waste are fear of toxicity, either from 'Teflon' itself or additives in some products. Although fears of contamination of underground water supplies by 'Teflon' scrap may be exaggerated, the possibility of small amounts of undesirable materials such as 'Triton'® and C-8 being present does exist.  For this reason, we have elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

104.    In 1982, defendant DuPont knew that PFOA was contaminating the Ohio River and could be present in drinking water that came from the Ohio River.  An internal DuPont memo dated October 19, 1982 cited analysis and projections of estimated human PFOA exposure from drinking contaminated Ohio River water.

105.    On November 23, 1982, defendant DuPont's then Medical Director, Bruce Karrh, MD, wrote in an internal memorandum that "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter."

106.    By 1984 defendant DuPont became aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community. Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

107.    By 1984 Defendant DuPont began a program of secretly collecting samples of tap water reported to be from public drinking water supplies near the Washington Works plant and determining their PFOA levels.  DuPont found that PFOA was present in drinking water samples collected from locations in both Ohio and West Virginia in the vicinity of its Washington Works facility.

108.    By June of 1984 Defendant DuPont was aware that water supplied by the town of Little Hocking, Ohio, which was located "up-river" from the Washington Works plant contained PFOA levels of at least 500 ppt.  Because of the location of the contaminated wells in Little Hocking in regards to the Washington Works facility and the direction of flow of the Ohio River, Defendant DuPont knew that this contamination was caused by PFOA released into the air from its manufacturing facility.  Although Defendant DuPont knew that PFOA was persistent in the environment and that it was continuing to release PFOA into the air

22

meaning that such releases would likely increase the PFOA contamination in Little Hocking's drinking water, Defendant DuPont chose not to alert local, state or federal officials or the public.

109. By 1985, Defendant DuPont was aware that PFOA was leaching into groundwater beneath ponds that DuPont had previously used to dispose of PFOA contaminated sludge and was migrating through the groundwater under the plant into the public drinking water supply of Lubeck, WV, where DuPont found PFOA levels as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988.

110. By 1987 Defendant DuPont had conducted air modeling at its Washington Works facility that documented PFOA in the ambient air beyond the fence line of the property and drifting with the wind into nearby communities.

111. On June 11, 1987 Dr. Karrh, Defendant DuPont's Medical Director, told DuPont officials that the Washington Works plant needed to give "highest priority" to issues associated with the presence of PFOA outside the boundaries of the plant.

112. In January of 1992 defendant DuPont completed its purchase of the Lubeck wellfield it had previously found to be contaminated with PFOA.   It then tested the new wells that were being used by the Lubeck community for drinking water and found that these wells had even higher levels of PFOA than the old wells, even though the new wells were two miles further away from the Washington Works plant.   DuPont chose not to disclose its findings regarding the PFOA levels in the new Lubeck wells.   The contamination of these wells was not made public until 2001 when the West Virginia Division of Environmental Protection tested the drinking water in Lubeck.

113.    In late 1998 defendant 3M environmental scientist Richard Purdy wrote to his 3M colleague Georjean Adams and suggested that his food chain risk assessment of fluorochemicals produced by 3M once they entered the environment demonstrated a risk that could not be kept confidential.  In another email, Purdy stated "For 20 years the division has been stalling in the collection of data needed for evaluating the environmental impact of fluorochemicals.  PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates it is probably worse."

114.    On September 2, 1998, 3M told employee Lisa A. Clemen to "dispose of this work" relating to PFCs and to "clean out computer of all electronic data" relating to PFCs.

115.    In 1999 Purdy drafted a resignation letter which stated: "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process.   This has stymied intellectual development on the issue and stifled discussion of the serious ethical implications of decisions."

116.    Shortly after defendant 3M decided to terminate its production of PFOA in 2000, groundwater near the 3M Cottage Grove facility in Minnesota was discovered to be highly contaminated with PFOA.   Subsequently, perfluorinated compound (PFC) contamination including PFOA and PFOS was found in groundwater further away from the facility, in Washington and Dakota Counties.   In Oakdale, MN the average PFOA concentration in the municipal water was 570 ppt.  Closer to the Cottage Grove facility groundwater levels were measured as high as 619 ppb (619,000 ppt).

117.    The State of Minnesota has determined that over 100 square miles of groundwater have been contaminated by defendant 3M's disposal of PFCs and the source of

residential drinking water for over 125,000 Minnesotans has been affected by PFC waste disposal.

118.    Upon information and belief, defendants 3M and DuPont shared information about the environmental contamination potential of fluorochemicals such as PFOA and PFOS from as far back as the 1980s and the information alleged to be known by one defendant was made known to the other.

119.    Upon information and belief, defendants Atotech and MacDermid knew of the environmental studies and risks of PFOA and PFOS contamination.

**Plating Facilities Operating in the Town of Blades**

120.    Electroplating is a process of depositing a layer of a metal such as chromium, nickel, or copper onto another material for abrasion and wear resistance, corrosion protection, and decoration.  An electrical charge is applied to a tank (bath) containing an electrolytic salt solution.  The electrical charge causes the metal in the bath to dissolve in the solution and deposit onto objects placed into the plating bath.

121.    Fluorosurfactants, mist and fume suppressants, wetting agents, and emulsifiers are used in the electroplating process to reduce the release of chromium fog from the bath, and to improve the gloss, surface cracks, hardness and adhesion of the metal plating layer.  They are also an excellent detergent for plating parts.

122.    Procino Plating, Inc, k/n/a Procino Enterprises ("Procino"), was started in 1983 as an electroplating business, servicing car enthusiasts with show quality chrome plating.  In 1985, the business moved to its current locations at 901 South Market Street, Blades, Delaware 19973.

123.    In 1987, Procino experienced a boost in business when hard chrome plating lines were installed to accommodate DuPont as a customer.

124.    Procino manufactures hard chrome plated griddle plates for the food industry.

125.    Procino services many of the top 100 fastest growing food chains by way of griddle manufacturers.

126.    Procino used cadmium fluoroborate in its operations.  Fluoroborates are PFOS-containing compounds, and cadmium fluoroborate is a compound used to prepare electroplating baths for high steel strengths.

127.    On December 13, 2007 a surprise EPA and DNREC inspection occurred which found the storage and use of Fumetrol-140 and Barrett Snap.

128.    In 2013, the owner of Procino plead guilty to illegal storage of hazardous waste without a permit and violation of the Clean Water Act.  The basis for the criminal action was as follows:    from December 2007 through May 2010, Procino stored a tank containing approximately 450 gallons of liquid hazardous waste which originally had been used at the facility on its decorative chrome plating line.  In June 2009, Sussex County modified Procino's industrial user permit to specifically prohibit the discharge of waste water generated as a result of electroplating operations, and any waste or bi-products of the electroplating processes then in storage at the facility.  However, from June 2009 through March 2010, Procino processed, through its wastewater treatment plant, stored drums of chemicals which were leftover from its former electroplating operations and, in violation of its Clean Water Act mandated permit, discharged resulting wastewater to the Seaford treatment plant.

129.    In 2016, DNREC issued a Final Plan of Remedial Action to address environmental contamination at the Procino Plating site.  After receiving violations from DNREC and USEPA for improper handling of hazardous waste in 1994 and 2002, coupled with unsatisfactory inspections in 2007 and 2008, and initiation of a Federal criminal investigation for

the hazardous waste storage and wastewater treatment permit violations in 2010, DNREC conducted a Preliminary Assessment and Site Inspection of the Procino property in 2010 and 2011. During DNREC's investigations, chromium was detected in groundwater beneath the facility at concentrations exceeding applicable regulatory criteria. In July 2015, approximately 14 tons of chromium-impacted soil was removed from the suspected source area inside the Procino Plating building.

130.    Peninsula operated a plating facility at East 7th Street and River Road in Blades, Delaware from 1993 until it abandoned operations in the 1995 after a history of noncompliance with industrial waste discharge permits and Emergency Planning and Community Right-to-Know Act requirements.

131.    Peninsula was the subject of a United States Environmental Protection Agency ("USEPA") Removal Action in 1995. During the Removal Action, the USEPA disposed of drums of chemicals and bulk plating liquids. In 2007, two underground storage tanks were removed from the property. Peninsula used cadmium fluoroborate in its plating operations.

132.    Since April 2007, Defendant Blades Development LLC has owned the property upon which Peninsula formerly conducted its hard chrome plating or nonstick cookware manufacturing processes. Upon information and belief, PFOA and PFOS was released and continues to be released from the property due to Peninsula's handling, use, storage, and disposal of the PFC-Containing Products. Since taking ownership of the property, Defendant Blades Development LLC has failed to ensure that PFOA and PFOS would not be released from the property.

133.    PFC's, including PFOA and PFOS, are used in the hard chrome plating and nonstick cookware manufacturing processes conducted by both Procino and Peninsula.

27

134.    Upon information and belief, the PFC-Containing Products used in the hard chrome plating and nonstick cookware manufacturing processes conducted by Peninsula and Procino were manufactured, distributed, and supplied by 3M, DuPont, Atotech, and MacDermid.

135.    Upon information and belief, Peninsula and Procino stored, used, disposed and discharged PFOA and PFOS into the ground, water, groundwater, and environment.

136.    Procino's and Peninsula's facilities are in close proximity to the Nanticoke River and municipal and private water supply wells for the Town of Blades and surrounding areas.

**Discovery of PFOA in the Town of Blades' Water Supply**

137.    The community of the Town of Blades, and surrounding area, in Sussex County, Delaware, receives potable water either from private wells, or from three (3) public wells operated by the Town of Blades.

138.    The Town of Blades municipal authority provides potable water to approximately 1,600 persons within the Town of Blades limits.

139.    On May 2, 2012, the USEPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3") which required public water systems nationwide to monitor for thirty (30) contaminants of concern between 2013 and 2015.

140.    The UCMR3 Rule included the requirement that public water systems sample for six perfluorinated compounds ("PFC's"), including PFOA and PFOS.

141.    The Delaware Department of Natural Resources and Environmental Control ("DNREC") worked with the US Environmental Protection Agency ("USEPA") to determine if there was a potential for the Town of Blades drinking water wells to contain PFCs due to manufacturing processes that had historically operated in the area.

142.    DNREC undertook water testing and found that all 3 of the Town's public wells contained concentrations of PFC's averaging twice the federal health advisory level and ranging from 96.2 parts per trillion to 187.1 parts per trillion.  Specifically, samples collected from the public wells in February 2018 by the EPA Removal Program contained PFOS concentrations ranging from 53 parts per trillion to 210 parts per trillion and PFOA concentrations ranging from 19 parts per trillion to 26 parts per trillion.  Samples collected from private wells contained PFOS concentrations ranging from 44-350 parts per trillion and PFOA concentrations ranging from 14-47 parts per trillion.   Samples collected from Procino wells contained PFOS concentrations up to 2,820 parts per trillion, more than 40 times the EPA's Health Advisory Level.

143.    On February 8, 2018, DNREC and the Delaware Division of Public Health ("DPH") began notifying the residents of the Town of Blades not to drink from the town's municipal wells

144.    Prior to the disclosure of the UCMR3 data, there was no notification to the residents of the Town of Blades that the water was contaminated with carcinogenic PFOA and PFOS.

145.    The Putative Class represents approximately 1,600 residents of the Town of Blades, and individuals residing outside of the Town of Blades who receive their water from private drinking wells, who were exposed to drinking water contaminated with PFOA and PFOS from private and municipal wells.

**Health Effects of PFOS and PFOA Exposure**

146.    Fluorochemicals such as PFOA and PFOS are stable molecules and therefore persistent.  As such, PFOA and PFOS has the potential to accumulate in the body with repeated exposures and to resist degradation in the environment.

147.    PFCs such as PFOA and PFOS do not break down into non-PFCs in the environment.  As a result, they are persistent when released into soil or water.  Because they are water-soluble, they are also mobile and do not remain where they were released.

148.    PFCs such as PFOA and PFOS can remain in the environment for years and move through air, soil and through and into ground-water and other bodies of water, such as rivers, lakes, streams, aquifers, etc.

149.    PFCs such as PFOA and PFOS leach through the soil and are mobile in the environment, such that they pollute ground- and surface-water and the surrounding environment.  Their vapors are also carried in the air, causing widespread contamination and public health issues from inhalation.

150.    Human and animal exposure to PFCs such as PFOA and PFOS leads to build-up of these substances in the body ("bio-accumulation"), particularly in the blood, kidney and liver.

151.    PFCs such as PFOA and PFOS cause a wide variety of illnesses, including: cancer (further including kidney and testicular cancer); thyroid disease; ulcerative colitis; high cholesterol and low LDL-cholesterol, which in turn cause cardiovascular and circulatory events; and pregnancy-induced hypertension.

152.    Many parties have studied PFOA and PFOS, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

153.    The panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

154.    Health effects of PFOS are at least as bad as those of PFOA.

155.    In the May 2015 "Madrid Statement on Poly and Perfluoralkyl Substances (PFASs)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

156.    The USEPA's Lifetime Health Advisory and Health Effects of 70 ppt set in May 2016 was an attempt to identify the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.[4]

157.    Many states, however, have issued lower regulatory limits. For example, Vermont has set a combined level of 20 ppt for PFOA and PFOS and New Jersey has set a maximum contaminant level (MCL) of 14 ppt for PFOA.

158.    California has noticed its intent to list PFOA and PFOS to its Prop 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.

---

[3] Blum A., Balan SA, Scheringer M., Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Linderman AE, Peaslee G, deVoogt P, Wang Z, Weber R. 2015. The Madrid Statement on poly- and perfluoralkyl substances (PFOSs). Environ. Health Perspect. 123:A107-A111; http://dx.doi.org/10.1289/ehp.1509934.
[4] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101 (May 25, 2016)

159.     The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which devoted $7 Million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into long-term health effects of PFOA and PFOS exposure.

160.     In February 2019, the CDC announced that it would begin testing residents of New Castle County, Delaware who were exposed to PFOA and PFOS from aqueous film-forming foam used at the New Castle County Airport and Air National Guard.

161.     Delaware currently follows the USEPA level of 70 ppt for combined PFOA and PFOS levels.

**The Putative Class and Plaintiffs Exposure and Damages**

162.     The Putative Class includes residents of the Town of Blades, and individuals residing outside of the Town of Blades who receive their water from private wells, who were exposed to drinking water contaminated with PFOA and PFOS from private and municipal wells.

163.     Plaintiffs and the Putative Class have been injured as a result of receiving water with elevated levels of PFCs, including PFOA and PFOS.

164.     Plaintiffs and the Putative Class have suffered exposure, personal injury, bioaccumulation of PFCs in their blood which causes known cancers and diseases, property damage and the diminution of property value as a result of the PFC contamination of the municipal and private water supplies.

165.     As a result of years of consuming contaminated water, the Plaintiffs and the Putative Class have been unknowingly exposed for many years to PFCs at concentrations hazardous to their health through the ingestion and dermal absorption of PFOA and PFOS.

166.    The properties of the Plaintiffs and the Putative Class have been damaged as a result of the presence of PFCs in their homes, their soil, surrounding property and potable water supply.

167.    Plaintiffs and the Putative Class seek recovery from all Defendants for injuries, damages and losses suffered by the Plaintiffs, each of whom suffered injuries as a direct and proximate result of exposure to and consumption of PFC-contaminated water from the municipal and private drinking water supplies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

169.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery.

170.    Plaintiffs are members of the proposed Class they seek to represent.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

171.    Excluded from the Class are:

    a.  Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representatives, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b. The Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family;

c. Any Class counsel or their immediate family members; and

d. All government entities.

172. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into sub-classes, or modified in any other way.

## Numerosity and Ascertainability

173. This action meets the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because the number of impacted individuals, upon information and belief, have reached the thousands, making individual joinder of Class Members' respective claims impracticable.  While the exact number of Class Members is not yet known, a precise number can be ascertained from objective criteria such as U.S. Federal Census records, the State of Delaware, and the public records of the municipal entity(ies), and through other appropriate discovery.  The resolution of the claims of the Class Members in a single action will provide substantial benefits to all parties and ease the administrative burden on the Court.  It is expected that the Class Members will number in the thousands.

174. Finally, Class Members can be notified of the pendency of this action by Court-approved notice methods.

## Typicality

175. Pursuant to Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants.  Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred

damages and losses related to the introduction of PFOA, PFOS, and other PFCs into the water supplies operated by the Town of Blades as well as private wells in the area, causing personal injury and property damages.

176.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

### Adequacy of Representation

177.    Plaintiffs will serve as fair and adequate class representatives because their interests, as well as the interests of their counsel, do not conflict with the interests of other members of the Class they seek to represent.

178.    Further, Plaintiffs have retained counsel competent and well experienced in class action and environmental tort litigation.

179.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.  Neither the Plaintiffs nor their counsel has interests adverse to the Class.

### Predominance of Common Issues

180.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under Rule 23(b)(3).  The answers to these common questions will advance resolution of the litigation as to all Class Members.  Common legal and factual issues include:

    a.   Whether Defendants engaged in the conduct alleged herein;

35

b.   Whether Defendants knew or should have known that exposure to PFOA and PFOS could increase health risks;

c.   Whether Defendants knew or should have known that manufacturing products containing PFOA and PFOS was unreasonably dangerous;

d.   Whether Defendants knew or should have known that PFOA and PFOS were persistent, stable, and mobile chemicals that were likely to contaminate groundwater supplies

e.   Whether Defendants failed to sufficiently warn of the potential for harm that resulted from the use of their products;

f.   Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS and failed to warn purchasers of their products, Plaintiffs, the Class and the public of the same;

g.   The extent to which Defendants knew about the PFOA and PFOS contamination in the groundwater in the Town of Blades;

h.   Whether the Defendants owed a duty to Plaintiffs and the Class to refrain from the actions that caused the contamination of the drinking water with PFOA and PFOS;

i.   Whether Defendants made unlawful and misleading representations of material omissions with respect to the health impacts of PFOA and PFOS;

j.   Whether Plaintiffs and Class Members were exposed to water containing elevated levels of PFOA and PFOS;

k.   Whether the PFOA and PFOS contamination caused and continues:

       i.      To cause a continuous invasion of the property rights of the Plaintiffs and Class such that the property values within the Town of Blades have and/or continue to decline in value following the disclosure of the PFOA and PFOS contamination;

      ii.     To substantially interfere with Plaintiffs' and the Class' use and enjoyment of their property;

l.  Whether Plaintiffs and Class Members are entitled to damages and other monetary relief and other equitable relief, including, but not limited to punitive damages, and if so, in what amount;

m.  Whether the members of the Classes have sustained damages and the proper measure of damages; and

n.  Whether Defendants are liable to Plaintiffs and the Class for their actions.

### Superiority

181.    The class action mechanism is superior to any other available means of fairly and efficiently adjudicating this case. Given that thousands of individuals were and continue to be impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Classes to litigate their respective claims individually due to the risk of producing inconsistent or contradictory judgments, generating increased delays and expense, and wasting judicial resources. No unusual difficulties are likely to be encountered in the management of this class action. Therefore, the class action mechanism minimizes prospective management challenges and provides the efficiency of a single adjudication under the comprehensive oversight of a single court.

## THE PARTIES

### Class Representatives with Individual Personal Injury and Property Damage Claims

182.    Plaintiff Doris Banks is a resident of the Town of Blades, who currently resides at 26894 Bethel Concord Road, Seaford, Delaware 19973.  The property currently receives water from a private well.  PFCs have entered the property, including but not limited to, through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Doris Banks has been exposed to elevated levels of PFCs and they have bioaccumulated in her blood.  As a result of her exposure to PFCs in the contaminated water supply, Doris Banks has been diagnosed with thyroid disease, high cholesterol, and high blood pressure, and is at an increased risk of developing several health conditions, including but not limited to, effects on the liver and immune system, ulcerative colitis, and kidney cancer.

183.    Plaintiff Candy Caporale is a resident of the Town of Blades, who currently resides at 11 East 4th Street, Blades, Delaware 19973.  The property currently receives water from the Town of Blades municipal water supply.  PFCs have entered the property, including but not limited to, through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn.  Plaintiff Candy Caporale has been exposed to elevated levels of PFCs and they have bioaccumulated in her blood.  As a result of her exposure to PFCs in the contaminated water supply, Candy Caporale has been diagnosed with liver disease, kidney disease, thyroid disease, high cholesterol, high blood pressure, and ulcerative colitis, and is at an increased risk of developing several health conditions, including but not limited to effects on the immune system.

184.    Plaintiff Bruce Davis is a resident of the Town of Blades, who currently resides at 26217 River Road, Seaford, Delaware 19973.  The property currently receives water from the Town of Blades municipal water supply.  PFCs have entered the property, including but not

limited to, through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Bruce Davis has been exposed to elevated levels of PFCs and they have bioaccumulated in his blood. As a result of his exposure to PFCs in the contaminated water supply, Bruce Davis is at an increased risk of developing several health conditions, including but not limited to, high blood pressure, effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, ulcerative colitis, testicular cancer and kidney cancer.

185.    Plaintiff Gene Sullenberger is a resident of the Town of Blades, who currently resides at 26107 River Road, Seaford, Delaware 19973. The property currently receives water from the Town of Blades municipal water supply. PFCs have entered the property, including but not limited to, through the accumulation of PFCs in the pipes, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Gene Sullenberger has been exposed to elevated levels of PFCs and they have bioaccumulated in his blood. As a result of his exposure to PFCs in the contaminated water supply, Gene Sullenberger is at an increased risk of developing several health conditions, including but not limited to, high blood pressure, effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, ulcerative colitis, testicular cancer and kidney cancer.

186.    Plaintiff Christine Wootten is a resident of the Town of Blades, who currently resides at 26107 River Road, Seaford, Delaware 19973. The property currently receives water from the Town of Blades municipal water supply. PFCs have entered the property, including but not limited to, through the accumulation of PFCs in the pipers, faucets, showerheads, and appliances, as well as through watering the lawn. Plaintiff Christine Wootten has been exposed to elevated levels of PFCs and they have bioaccumulated in her blood. As a result of her

exposure to PFCs in the contaminated water supply, Christine Wootten has been diagnosed with chronic kidney disease, and is at an increased risk of developing several health conditions, including but not limited to, high blood pressure, effects on the liver and immune system, high cholesterol levels, changes in thyroid hormone, ulcerative colitis, and kidney cancer.

**Defendants**

187.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendant(s) committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

188.    Upon information and belief, each of the Defendants are responsible, negligently, intentionally, and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants, or employees, or due to the ownership, maintenance, or control of the instrumentality causing them injury, or in some other actionable manner.

189.    3M is a Delaware corporation and does business throughout the United States, including Delaware.  3M may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

190.    Defendant E.I. DUPONT DE NEMOURS AND COMPANY ("DuPont"), is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principal executive office located at 974 Centre Rd., Wilmington, DE.  At all times relevant

hereto, DuPont manufactured and sold products containing PFCs, and polytetrafluoroethylene (PTFE) dispersions, including mist and fume suppressants, fluorosurfactants, wetting agents, and emulsifiers containing PFOA and PFOS, to Procino and Peninsula that were used at these Procino's and Peninsula's facilities in their manufacturing processes as described herein. DuPont may be served via its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

191.    ATOTECH USA, LLC is a foreign business entity doing business in the State of Delaware.  Atotech may be served through its registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

192.    MACDERMID, INC. is a foreign business entity doing business in the State of Delaware corporation and is subject to service of process, in accordance with 10 Del. C. § 3104 at its headquarters 245 Freight Street, Waterbury, CT 06702.

193.    PROCINO is a Delaware corporation and has a principal place of business at 901 South Market Street, Blades, Delaware 19973.  Procino Enterprises may be served at 6211 Phillips Landing Road, Laurel, DE 19956.

194.    BLADES DEVELOPMENT LLC is a Delaware corporation having its principal place of business and/or registered agent located at 50 Albe Drive, Newark, Delaware 19702. Blades Development LLC is the owner of real property upon which Peninsula Plating formerly conducted operations.

## CAUSES OF ACTION FOR CLASS ACTION AND INDIVIDUAL CLAIMS

### AS AND FOR A FIRST CAUSE OF ACTION: Negligence
### (as to Defendant Procino)

195.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

41

196.    Defendant Procino knew or should have known that exposure to PFC-Containing Products was hazardous to the environment and human health.

197.    Defendant Procino knew or should have known that the manner in which the PFC-Containing Products were being handled, used, stored and disposed would result in the contamination of the municipal supply in the Town of Blades and private wells within and surrounding the Town of Blades.

198.    Defendant Procino knew or should have known that safety precautions would be required to prevent the release of PFC-Containing Products into the surrounding environment.

199.    Defendant Procino knew or should have known that it was unsafe or unreasonably dangerous to handle, store, use and/or dispose of the PFC-Containing Products in the ways in which it did.

200.    Defendant Procino, as owners and operators of a facility that utilized PFC-Containing Products, owed Plaintiffs and Class Members a cognizable duty to exercise reasonable care to ensure that PFC-Containing Products were handled, used, stored and disposed of reasonably and properly so as not to discharge hazardous or toxic substances, including PFOA and PFOS, into the environment.

201.    Defendant Procino owed Plaintiffs and Class Members a duty to ensure that the hard chrome plating and non-stick cookware manufacturing processes it employed would not unreasonably jeopardize the drinking water supply (both the municipal and private wells) relied upon by the Town of Blades community and surrounding areas.

202.    Defendant Procino breached its duty by allowing PFC-Containing Products to be released into the drinking water (both the municipal and private wells) of the Town of Blades and surrounding areas when it unreasonably handled, used, stored and disposed of PFC-

Containing Products in such a manner that ensured the PFOA and PFOS would enter into the environment and groundwater.

203.    As such, the Defendant Procino, negligently, grossly negligently, recklessly, willfully, wantonly, or intentionally created the contamination of drinking water in and around the Town of Blades.

204.    Defendant Procino further breached the duties owed to the Plaintiffs and Class Members by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

205.    Defendant Procino's failure to notify the Plaintiffs and Class Members in a timely manner of the contamination of the Town of Blades' drinking water, and, consequently, the presence of PFOA and PFOS in the real properties of Plaintiffs and Class Members constitutes another breach of its duties that Defendant Procino owed the Plaintiffs and Class Members.

206.    Defendant Procino's breaches of its duties were direct and proximate causes of Plaintiffs' and Class Members' damages and the imminent, substantial, and impending harm to their homes and health.

207.    Defendant Procino's breaches of its duties caused the drinking water in both the municipal and private wells to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

208.    Further, due to Defendant Procino's breach of their duty to timely notify the community and act reasonably in handling, using, storing and disposing of PFC-Containing Products, Plaintiffs and the Class Members were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and Class Members have expended or will be

forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

209.    Plaintiffs and Class Members suffered foreseeable injuries and damages as a proximate result of Defendant Procino's negligent breach of its duties as set forth above.  At the time Defendant Procino breached its duties to Plaintiffs and Class Members, Defendant Procino's acts or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and Class Members so apparent as to entitle them to be protected against such actions or inactions.

210.    Accordingly, Plaintiffs and Class Members seek damages from Defendant Procino, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate Plaintiffs and Class Members for the injuries and losses sustained and to restore Plaintiffs and Class Members to the original position, including but not limited to the difference between the current value of Plaintiffs' and Class Members' properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendant Procino's conduct in an amount to be proved at trial.

### AS AND FOR A SECOND CAUSE OF ACTION:  Negligence
### (as to Defendants 3M, DuPont, Atotech, and MacDermid)

211.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

212.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

213.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that the manner in which they were manufacturing, marketing and selling the PFC-Containing Products identified herein, was hazardous to human health, bioaccumulated in the blood, and caused serious health effects, including cancer.

214.    Defendants 3M, DuPont, Atotech and MacDermid also knew or should have known that PFOA and PFOS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

215.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that the manner in which they were manufacturing, marketing and selling the PFC-Containing Products identified herein would result in the contamination of the drinking water supplies of Plaintffs and Class Members as a result of the proximity of Procino and Peninsula to the municipal and private water supplies of the Town of Blades and surrounding areas.

216.    Defendants 3M, DuPont, Atotech and MacDermid owed a duty to Plaintiffs and Class Members to act reasonably and not place inherently dangerous PFC-Containing Products identified herein into the marketplace when its release into the drinking water supplies was imminent and certain.

217.    Defendants 3M, DuPont, Atotech and MacDermid marketed and sold their PFC-Containing Products identified herein with knowledge that large quantities of PFOA and PFOS would be used, stored, and disposed of in the hard chrome plating and non-stick cookware manufacturing processes, including by Procino and Peninsula, in such a manner that dangerous chemicals would be released into the environment.

218.    Knowing of the dangerous and hazardous properties of the PFC-Containing Products identified herein, and the manner in which the PFC-Containing Products would be used, stored, and disposed of at places like Procino and Peninsula, it was foreseeable that PFOA and PFOS from the PFC-Containing Products would contaminate the surrounding environment, groundwater, and drinking water supplies of Plaintiffs and Class Members as a result of the proximity of Procino and Peninsula to the municipal and private water supplies of the Town of Blades and surrounding areas.

219.    Defendants 3M, DuPont, Atotech and MacDermid therefore knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding environment, groundwater, and drinking water supplies.

220.    The magnitude of the burden on Defendants 3M, DuPont, Atotech and MacDermid to guard against this foreseeable harm to Plaintiffs and the Class was minimal, as the practical consequences of placing this burden on Defendants 3M, DuPont, Atotech and MacDermid amounted to a burden to provide adequate instructions, proper labeling and sufficient warnings about their PFC-Containing Products.

221.    As manufacturers, Defendants 3M, DuPont, Atotech and MacDermid were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their PFC-Containing Products.

222.    Considering the above factors related to risk, foreseeability, social utility, burden of guarding against the harm, and the practical consequences of placing that burden on Defendants 3M, DuPont, Atotech and MacDermid, Defendants 3M, DuPont, Atotech and MacDermid therefore owed a cognizable duty to Plaintiffs and the Class not to contaminate their

municipal and private well drinking water supplies and the surrounding environment with PFC-Containing Products, containing PFOA and PFOS.

223.    Defendants 3M, DuPont, Atotech and MacDermid had a duty to warn of the hazards associated with the PFC-Containing Products, containing PFOA and PFOS, entering and poisoning the environment and groundwater.

224.    Defendants 3M, DuPont, Atotech and MacDermid, as manufacturers, marketers and sellers of the PFC-Containing Products owed Plaintiffs and the Class a cognizable duty to exercise reasonable care to ensure that the PFC-Containing Products were manufactured, marketed and sold in such a way as to ensure that the end users of PFC-Containing Products were aware of the potential harm PFOA and PFOS can cause to human health and the environment.

225.    Upon learning of the release of PFOA and PFOS, Defendants 3M, DuPont, Atotech and MacDermid owed Plaintiffs and the Class a duty to warn and notify Plaintiffs and the Class of the release of the contamination before it injured Plaintiffs and the Class or to act reasonably to minimize the damage to Plaintiffs and the Class.

226.    Defendants 3M, DuPont, Atotech and MacDermid breached their duties by allowing PFOA and PFOS to be released into the drinking water supplies of Plaintiffs and Class Members, through their failure to warn and notify the end users of the PFC-Containing Products about the danger that PFOA and PFOS would enter the environment and groundwater.

227.    As such, Defendants 3M, DuPont, Atotech and MacDermid negligently, gross negligently, recklessly, willfully, wantonly, or intentionally breached their legal duties to the Plaintiffs and the Class, causing the contamination of the municipal and private well drinking water supplies in and around the Town of Blades.

228.     Defendants 3M, DuPont, Atotech and MacDermid further breached the duties owed to the Plaintiffs and the Class by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

229.     Defendant 3M's, DuPont's, Atotech's and MacDermid's failures to notify the Plaintiffs and the Class in a timely manner of the contamination of drinking water supplies, and, consequently, the presence there of PFOA and PFOS constitutes another breach of the duties that Defendants 3M, DuPont, Atotech and MacDermid owed Plaintiffs and the Class.

230.     Defendant 3M's, DuPont's, Atotech's and MacDermid's breaches of their duties caused the drinking water in both the municipal and private well supplies to become contaminated with unsafe and dangerous levels of PFOA and PFOS.

231.     Further, due to Defendant 3M's, DuPont's, Atotech's and MacDermid's breaches of their duty to timely notify the community and act reasonably in warnings of the presence of PFOA and PFOS in the PFC-Containing Products, Plaintiffs and the Class were forestalled from undertaking effective and immediate remedial measures, and Plaintiffs and the Class have expended or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendant 3M's, DuPont's, Atotech's and MacDermid's negligence for many years.

232.     Plaintiffs and the Class suffered foreseeable injuries and damages as a proximate result of Defendant 3M's, DuPont's, Atotech's and MacDermid's negligent breach of their duties as set forth above.  At the time Defendants 3M, DuPont, Atotech and MacDermid breached their duties to Plaintiffs and the Class, Defendant 3M's, DuPont's, Atotech's and MacDermid's acts or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs and the Class so apparent as to entitle them to be protected against such actions or inactions.

233.    Accordingly, Plaintiffs and Class Members seek damages from Defendants 3M, DuPont, Atotech and MacDermid, in an amount to be determined at trial, directly resulting from their injuries to their persons and property, in a sufficient amount to compensate Plaintiffs and Class Members for the injuries and losses sustained and to restore Plaintiffs and Class Members to the original position, including but not limited to the difference between the current value of Plaintiffs' and Class Members' properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, including the need for medical monitoring as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendant 3M's, DuPont's, Atotech's and MacDermid's conduct in an amount to be proved at trial.

### AS AND FOR A THIRD CAUSE OF ACTION: Medical Monitoring
### (as to all Defendants)

234.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

235.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, selling, handling, using, storing and/or disposing of PFC-Containing Products would result in the contamination of the drinking water supplies of Plaintiffs and Class Members as a result of the proximity of Procino and Peninsula to the municipal and private water supplies of the Town of Blades and surrounding areas.

236.    Defendants knew or should have known that exposing humans to PFC-contaminated water would be hazardous to human health and the environment.

237.    The Plaintiffs and the Classes have been exposed to PFOA, PFOS, and potentially other toxic substances that resulted from the handling, use, storage, and discharge of PFC-

Containing Products used in the hard chrome plating and nonstick cookware manufacturing processes at Procino and Peninsula.

238.    As described more fully above in this Complaint, PFOA and PFOS exposure leads to the bioaccumulation of PFOA and PFOS in the blood, seriously increasing the risk of contracting numerous diseases.

239.    Medical tests currently exist that can determine the level of PFOA and PFOS in the blood.

240.    Given that exposure to and bioaccumulation of PFOA and PFOS significantly increases the risk of contracting a serious medical condition, periodic medical examinations to detect latent diseases are both reasonable and necessary.  A thorough medical monitoring plan, following common and accepted medical practices, can and should be developed for the Plaintiffs and the Classes to assist in the early detection and beneficial treatment of the diseases that can develop as a result of exposure to PFOA and PFOS.

### AS AND FOR A FOURTH CAUSE OF ACTION:  Breach of Implied Warranty (as to Defendants 3M, DuPont, Atotech and MacDermid)

241.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

242.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

243.    Defendant 3M, DuPont, Atotech and MacDermid knew or should have known that the manner in which they were manufacturing, marketing, and selling the PFC-Containing Products was hazardous to human health and the environment.

244.    Defendant 3M, DuPont, Atotech and MacDermid knew or should have known that the manner in which they were manufacturing, marketing, and selling, of the PFC-

50

Containing Products would result in the contamination of Plaintiffs' and Class Members' water supplies as a result of the proximity of Procino and Peninsula to the municipal and private water supplies of the Town of Blades and surrounding areas.

245.    Defendants 3M, DuPont, Atotech and MacDermid impliedly warranted that their PFC-Containing Products were of good and merchantable quality.  Defendants 3M, DuPont, Atotech and MacDermid knew or ought to have reasonably anticipated the PFC-Containing Products would be repeatedly and routinely discharged into the air, ground, and water in and around Procino and Peninsula.  Defendants 3M, DuPont, Atotech and MacDermid breached their implied warranty that these products were of good and merchantable quality by causing the Plaintiffs' and Class Members exposure to PFOA and PFOS, which was a proximate and producing cause of Plaintiffs' and Class Members' injuries.

### AS AND FOR A FIFTH CAUSE OF ACTION:  Trespass
### (as to Defendant Procino and Defendant Blades Development LLC)

246.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully stated herein.

247.    Plaintiffs and Class Members, as described above, are owners or occupiers of real property with the lawful right of possession.

248.    The Procino and Peninsula facilities operated without sufficient management and pollution controls to limit and eliminate releases of toxic PFOA and PFOS into the air, dust, soil, and groundwater from the facilities into the residential properties owned or occupied by Plaintiffs and Class Members.  As a result, Procino and Peninsula released toxic PFOA and PFOS from the facilities into the air, dust, soil, and groundwater of the properties owned and/or occupied by Plaintiffs.

249.    Throughout the course of their operation of the facilities, Procino and Peninsula released PFOA and PFOS into the environment, and failed to mitigate or remediate contamination that had been released from their facilities.  The releases by Procino and Peninsula from their facilities have traveled through the air and soils and ground water and physically intruded onto and damaged the properties of Plaintiffs and Class Members, causing contamination of the soil, the dust, the household water, the ground water wells, household water systems, structures, and other parts of the properties of Plaintiffs and Class Members with PFOA and PFOS that would not be present but for the actions of Procino and Peninsula. Procino's and Peninsula's PFOA and PFOS contamination has further migrated through the soil and into the groundwater that Plaintiffs and Class Members have the right to use and have used for their water supply.

250.    At all times relevant to the present cause of action, Defendant Procino had exclusive control over its facility which, through acts and/or omissions by Defendant Procino in the handling, use, storage and disposal of PFC-Containing Products and other chemicals, resulted in the contamination of the water supply relied upon by Plaintiffs at all relevant times.

251.    At the time the above-described, affirmative, voluntary, negligent and/or intentional acts were performed by Defendants Procino and Peninsula, Defendants Procino and Peninsula had good reason to know or expect that large quantities of PFOA or PFOS would and/or could be introduced into the persons and property of Plaintiffs and Class Members.

252.    Since April 2007, Defendant Blades Development LLC has owned the property upon which Peninsula formerly conducted its hard chrome plating or nonstick cookware manufacturing processes.  Upon information and belief, PFOA and PFOS was released and continues to be released from the property due to Peninsula's handling, use, storage, and disposal

of the PFC-Containing Products.  Since taking ownership of the property, Defendant Blades Development LLC has failed to ensure that PFOA and PFOS would not be released from the property.

253.    The above-described affirmative, voluntary, negligent and/or intentional acts were performed with the willful intent to cause PFOA and PFOS to be released into the drinking water for the Town of Blades and private wells surrounding the Town of Blades.

254.    Defendants Procino's and Blades Development LLC's negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA and PFOS to be released into the drinking water for the Town of Blades and private wells surrounding the Town of Blades.

255.    Defendants Procino's and Blades Development LLC's negligent, reckless, willful, wanton, and intentional failure to act and/or their affirmative choices of actions and following courses of action have caused PFOA and PFOS to enter and trespass upon the land and realty of the Plaintiffs and Class Members and cause an injury and unlawful intrusion to their possession and/or right of possession.

256.    Plaintiffs and Class Members have not consented and do not consent to the trespass of PFOA and PFOS contamination alleged herein.  Defendants Procino and Blades Development LLC knew or reasonably should have known that the Plaintiffs and Class Members did not and do not consent to this trespass.

257.    Defendants Procino's and Blades Development LLC's voluntary actions resulted in the immediate and continued trespass, injury and damage to Plaintiffs, their property and their right of possession of their property.

258.    Further, Defendants Procino's and Blades Development LLC's actions in introducing unknown quantities of PFOA and PFOS into the drinking water of the Town of Blades and, consequently, the persons and property of Plaintiffs and Class Members were done with actual malice, and in wanton, willful or reckless disregard for Plaintiffs' and Class Members' rights, health, and property.

259.    Additionally, or alternatively, Defendants Procino's and Blades Development LLC's decisions to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the PFOA and PFOS release and contamination after having knowledge and notice of said contamination were done with actual malice, and in wanton, willful or reckless disregard for the rights, health, and property of Plaintiffs and Class Members.

260.    Accordingly, Plaintiffs and Class Members seek general damages from Defendants Procino and Blades Development LLC, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs to their original position, including but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, the cost to bring an end to the trespass, injury to persons which includes but is not limited to the need for medical monitoring and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants Procino's and Blades Development LLC's conduct in an amount to be proved at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION: Private Nuisance – Private Well Owners Only**
**(as to Defendant Procino and Defendant Blades Development LLC)**

261.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

262.    Defendants Procino's and Blades Development LLC's reckless, intentional and unreasonable, abnormally dangerous, and/or negligent acts and omissions, as alleged above, resulted in the discharge of PFOA and PFOS into the environment, contaminating the private wells from which Plaintiffs and Class Members obtained their drinking water.

263.    The discharge of PFOA and PFOS into the environment resulted in the contamination of the aquifer and private water supply wells with hazardous levels of PFOA and PFOS.

264.    The contamination of the groundwater and water supply has prevented and continues to prevent Plaintiffs and Class Members from consuming or using the water at their property or residence and constitutes a substantial interference with the right of Plaintiffs and Class Members and their property.

265.    The inability to use potable drinking water at their residences has caused the Plaintiffs and Class Members significant inconvenience and expense.

266.    By reason of the foregoing, Defendants Procino and Blades Development LLC are liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Defendants Procino's and Blades Development LLC's actions or omissions, the amount of which will be determined at trial, plus reasonable attorneys' fees and costs.

267.    Accordingly, Plaintiffs and Class Members seek general damages from Defendants Procino and Blades Development LLC, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous

trespass, the value to end the trespass, injury to persons, including the need for medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants Procino's and Blades Development LLC's conduct in an amount to be proved at trial.

### AS AND FOR A SEVENTH CAUSE OF ACTION: Fraudulent Concealment (as to Defendants 3M, DuPont, Atotech, and MacDermid)

268.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

269.    Defendants 3M, DuPont, Atotech and MacDermid knew of the harms, including environmental damages and health risks, posed by the PFC-Containing Products that 3M, DuPont, Atotech and MacDermid provided to Procino and Peninsula.

270.    Nevertheless, Defendants 3M, DuPont, Atotech and MacDermid intentionally concealed and failed to disclose to Plaintiffs and Class Members the harmful nature of these toxic substances.

271.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that Plaintiffs and Class Members would be exposed to PFOA and PFOS from the handling, use, storage and disposal of PFC-Containing Products by Procino and Peninsula.

272.    Defendants 3M, DuPont, Atotech and MacDermid knew or should have known that the concealment would subject Plaintiffs and Class Members to additional exposure and damages, which would have been avoided if Defendants 3M, DuPont, Atotech and MacDermid had not concealed the truth.

273.    Despite this, Defendants 3M, DuPont, Atotech and MacDermid continued to affirmatively misrepresent the safety of the PFC-Containing Products.

274.    If Plaintiffs and Class Members had known of the material information intentionally concealed by Defendants 3M, DuPont, Atotech and MacDermid, Plaintiffs and Class Members would not have consented to being exposed to these toxic chemicals and would have taken steps to mitigate their losses.

275.    Plaintiffs and Class Members reasonably believed that the ground and water in and around Procino's and Peninsula's facilities did not pose any health hazard.

276.    Plaintiffs and Class Members had no reason to suspect they were being exposed to PFOA and PFOS.  Contamination by PFOA and PFOS did not alter the taste or appearance of the ground or water, and the resulting human ailments are not immediately apparent and do not always occur immediately.

277.    Plaintiffs and Class Members, therefore, justifiably failed to discover their causes of action against all Defendants until the recent publication of ground and water test results revealed the existence of PFOA and PFOS in the municipal and private water supplies of the Town of Blades and surrounding areas.

278.    Defendants 3M and DuPont, and concealed the hazardous nature of their PFC-Containing Products, which are fundamental and operative facts that form the basis of the causes of action alleged in this First Amended Complaint.

279.    At all times, Plaintiffs and Class Members exercised reasonable diligence in discovering and prosecuting their claims.

### AS AND FOR A EIGHTH CAUSE OF ACTION: Conspiracy
### (as to Defendants 3M, DuPont, Atotech and MacDermid)

280.    Plaintiffs and Class Members hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

57

281.    Defendants 3M, DuPont, Atotech and MacDermid actually knew of the health and environmental hazards which PFOA and PFOS posed to Plaintiffs and the Class Members.

282.    Beginning in the 1970s and continuing through the date of this Complaint, Defendants 3M, DuPont, Atotech and MacDermid formed joint task forces and committees and otherwise colluded for the avowed purpose of providing false or misleading information about PFOA and PFOS to the public, but with the true, unlawful purpose of:

   i.    Creating a market for PFOS and PFOS despite knowledge of the hazards which PFOA and PFOS posed to the groundwater in and around the Town of Blades and the residents who depend on such water;

   ii.    Concealing the environmental properties and toxic nature of PFOA and PFOS, and its impact on Plaintiffs, the Class Members and the environment; and

   iii.    Maximizing profits in a way Defendants knew would require them to contaminate Plaintiffs' drinking water and poison their bodies.

283.    Defendants 3M, DuPont, Atotech and MacDermid carried out their conspiracy by one or more of the following overt acts or omissions:

   i.    Intentionally representing to the USEPA, DNREC and the public that PFOA and PFOS was safe and did not pose an environmental or human health risk;

   ii.    Concealing the dangers of PFOA and PFOS (including toxicological information on the dangers of the chemicals to living organisms, adverse fate and transport characteristics and the propensity of PFOA and PFOS to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of PFOA and PFOS be suppressed and not otherwise published and by downplaying any adverse findings relating to PFOA and PFOS;

   iii.    Concealing the dangers of PFOA and PFOS from end users, sensitive receptors, water suppliers, and the users and consumers of groundwater, including well-users and those who consumed water from wells;

   iv.    Using their considerable resources to fight PFOA and PFOS regulation;

v.    Using their considerable resources to misdirect and prevent scientific investigation and research into the toxic nature of PFOA and PFOS, which was known to at least Defendants 3M and DuPont since no later than 1970, and to prevent the truth about the toxic nature of these products from being learned by Plaintiffs, Class Members, Defendants' customers, or the public; and

vi.    Collectively deciding to use PFOA and PFOS rather than other safer products in the plating industry because PFOA and PFOS was the most profitable product for the Defendants to use.

284.    As a direct and proximate result of the Defendants' above-described conspiracy, PFOA and PFOS, at all times relevant to this litigation has:

i.    Posed and continues to pose a health threat to Plaintiffs and the Class because it has bioaccumulated in their bodies; and

ii.    Will require testing and monitoring of Plaintiffs' and Class Members' health for known adverse health effects of PFOA and PFOS.

285.    Accordingly, Plaintiffs and Class Members seek general damages from Defendants 3M, DuPont, Atotech and MacDermid, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, the value to end the trespass, injury to persons, including the need for medical monitoring, and direct, consequential, and nominal damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants 3M's, DuPont's, Atotech's and MacDermid's conduct in an amount to be proved at trial.

## CLAIM FOR PUNITIVE DAMAGES
### (as to all Defendants)

286.    Plaintiffs and the Class hereby repeat, re-allege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

287.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and reckless conduct that caused the foregoing damage, nuisances, and injuries upon the persons of Plaintiffs and the Class, disregarding their protected rights.

288.    Defendants' willful, wanton, malicious, and reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFOA and PFOS, which they knew to be carcinogenic, was not ingested by Plaintiffs and the Class.

289.    Defendants have caused great harm to the water supplies of Plaintiffs and the Class and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and the Class demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.    an award certifying the Class;

B.    a declaration that Defendants acted with negligence, gross negligence, and willful, wanton, and reckless disregard for the health and safety of Plaintiffs and members of the Class;

C.    an order establishing a medical monitoring protocol for Plaintiffs and Class Members;

D.    an award to Plaintiffs and the Class of general, compensatory, exemplary, consequential, nominal, and punitive damages;

E.    an order for an award of attorney fees and costs, as provided by law;

F.    an award of pre-judgment and post-judgment interest as provided by law; and

G.    an order for all such other relief the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury of any and all issues in this matter so triable.

**NAPOLI SHKOLNIK, LLC**

*/s/ R. Joseph Hrubiec*
R. Joseph Hrubiec, Esq. (#5500)
919 N. Market Street, Ste. 1801
Wilmington, DE 19801
(302) 330-8025
RHrubiec@NapoliLaw.com

HUNTER SHKOLNIK (*pro hac vice* forthcoming)
PAUL J. NAPOLI (*pro hac vice* forthcoming)
360 Lexington Avenue, Eleventh Floor
New York, NY 10017
(212) 397-1000
Hunter@NapoliLaw.com
PNapoli@NapoliLaw.com

*Attorneys for Plaintiffs*

Dated:  February 7, 2020