**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DORIS BANKS, CANDY CAPORALE, BRUCE DAVIS, GENE SULLENBERGER, and CHRISTINE WOOTTEN, for themselves and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 19-1672-MN-JLH |
| E.I. DU PONT DE NEMOURS AND COMPANY, THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.), ATOTECH USA, LLC, MACDERMID, INC., PROCINO PLATING, INC., a/k/a PROCINO ENTERPRISES, a/k/a PROCINO, and BLADES DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## REPORT AND RECOMMENDATION

In this proposed class action, Plaintiffs allege that Defendants caused the groundwater in Blades, Delaware to be contaminated with perfluorinated compounds, resulting in harm to the class members' health and property.  Plaintiffs' First Amended Complaint ("FAC") (D.I. 44) alleges that two electroplating facilities in Blades, Delaware (which are now owned by Defendants Procino Plating, Inc. ("Procino") and Blades Development LLC ("Blades Development")) used products containing perfluorinated chemicals ("PFCs")—including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA")—manufactured and sold by Defendants Atotech USA, LLC ("Atotech") and MacDermid, Inc. ("MacDermid").  The FAC further alleges that Defendants E.I. DuPont de Nemours and Company ("DuPont") and The 3M Company ("3M") manufactured and sold PFOS and PFOA used to produce PFC-containing products sold by Atotech

and MacDermid, including products used in the Blades electroplating facilities.  The FAC alleges various causes of action.

Defendant Procino answered the FAC, but the other five Defendants filed separate motions to dismiss for failure to state a claim.  (D.I. 106; D.I. 109; D.I. 110; D.I. 113; D.I. 115.)  For the reasons set forth below, I recommend that each of the motions be GRANTED-IN-PART and DENIED-IN-PART.  Plaintiffs should be granted leave to amend their complaint within 21 days to address the deficiencies.

I.    **BACKGROUND**

The following facts are taken from the allegations in the FAC, which I assume to be true for purposes of resolving the motions to dismiss.[1]

PFOA and PFOS are human-made chemicals that belong to a class of fluorine-containing compounds called perfluorinated chemicals ("PFCs").  (FAC ¶¶ 4, 7, 13.)  PFOA and PFOS are used in the production of commercial and consumer nonstick cookware and in the hard chrome plating process.  (*Id.* ¶ 7.)

Defendant 3M began producing PFOA in 1947 and PFOS no later than 1948.  (*Id.* ¶ 5.)  It ceased making both around 2000.  (*Id.* ¶ 14.)  Other companies have also manufactured PFOA and PFOS in the United States, including Defendant DuPont, which began using PFOA in the 1950s and began manufacturing PFOA when 3M stopped, around 2000.  (*Id.* ¶¶ 6, 15, 16.)

PFOA and PFOS are extremely stable and can remain in the environment for years.  (*Id.* ¶¶ 7–9, 146–49.)  Studies show associations between human exposure to PFOA and PFOS and negative health effects, which can arise months or years after exposure.  (*Id.* ¶¶ 8–12, 150–61.)

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

According to Plaintiffs, 3M and DuPont have been aware of potential health risks associated with PFOA and PFOS exposure for decades. (*Id.* ¶¶ 26–100.) 3M and DuPont have also known for decades that PFOA and PFOS can leach into and move rapidly in groundwater and that they can contaminate drinking water supplies. (*Id.* ¶¶ 101–19.)[2]

Defendant Atotech is a surface-finishing solutions provider that manufactured and sold products containing PFOA and PFOS, including Fumetrol-140, a fume suppressant. (*Id.* ¶ 17.) MacDermid is a chemical products provider that manufactured and sold products containing PFOA and PFOS, including Barrett Snap, a wetting agent. (*Id.* ¶ 18.) Atotech and MacDermid knew about studies, reports, and publications demonstrating that PFOA and PFOS were associated with health risks. (*Id.* ¶ 95.) The FAC alleges, "[u]pon information and belief," that "PFOS and PFOA manufactured by 3M and DuPont was used in the production of mist and fume suppressants, fluorosurfactants, wetting agents and emulsifiers containing PFOA and PFOS . . . , including Fumetrol-140, Barrett Snap, and cadmium fluoroborate[, a PFOS-containing compound used in the electroplating process]." (*Id.* ¶¶ 19, 126, 134.)

Defendant Procino began operating an electroplating business in Blades, Delaware in 1985.[3] (*Id.* ¶¶ 7, 122.) Procino used cadmium fluoroborate in its operations. (*Id.* ¶ 126.) In 2007, the Environmental Protection Agency (EPA) and the Delaware Department of Natural Resources and Environmental Control (DNREC) conducted an inspection of Procino and discovered that it

---

[2] The FAC contains pages of factual allegations purportedly demonstrating 3M's and DuPont's knowledge of the health risks and environmental contamination associated with PFOA and PFOS. The precise details of those factual allegations are not particularly relevant to the parties' arguments, so I do not recite them here.

[3] "Electroplating is a process of depositing a layer of a metal such as chromium, nickel, or copper onto another material for abrasion and wear resistance, corrosion protection, and decoration." (FAC ¶ 120.)

was also storing and using Fumetrol-140 and Barrett Snap.  (*Id.* ¶ 127.)  In 2013, Procino pleaded guilty to illegally storing waste and violating the Clean Water Act from December 2007 to May 2010.  (*Id.* ¶ 128.)

Peninsula Plating operated a plating facility in Blades, Delaware from 1993 to 1995.  (*Id.* ¶¶ 7, 130.)  Peninsula used cadmium fluoroborate in its electroplating operations.  (*Id.* ¶ 131.)  Peninsula had a "history of noncompliance with industrial waste discharge permits" and was subject to an EPA removal action in 1995.  (*Id.* ¶ 130–31.)

The FAC alleges, "[u]pon information and belief," that Procino and Peninsula used PFC-containing products that were manufactured, distributed and supplied by Defendants 3M, DuPont, Atotech, and MacDermid.  (*Id.* ¶ 134.)  In 2007, Defendant Blades Development acquired the property formerly used by Peninsula.  (*Id.* ¶ 132.)

The Procino facility and the former Peninsula facility are close to the Nanticoke River and municipal and private water supply wells for Blades.  (*Id.* ¶ 136.)  In 2018, EPA and DNREC tested the water supply in Blades and discovered that the private and public wells contained concentrations of PFCs that exceeded the EPA's Health Advisory Level.  Samples collected from Procino wells contained PFOS concentrations more than 40 times the Health Advisory Level.  (*Id.* ¶ 142.)  On February 8, 2018, DNREC and the Delaware Division of Public Health began warning the residents of Blades not to drink from the town's municipal wells.  (*Id.* ¶ 143.)

The FAC alleges, "[u]pon information and belief," that "Peninsula and Procino stored, used, disposed and discharged PFOA and PFOS into the ground, water, groundwater, and environment."  (*Id.* ¶ 135.)  The FAC further alleges, "[u]pon information and belief," that PFOA and PFOS have been released and continue to be released from the property that housed the

Peninsula facility, due to Peninsula's handling, use, storage and disposal of PFC-containing products, and that Blades Development has failed to contain or prevent the release. (*Id.* ¶ 132.)

Plaintiffs are residents of Blades. (*Id.* ¶¶ 182–86.) Plaintiffs have been "exposed to elevated levels of PFCs and they have bioaccumulated in [Plaintiffs'] blood." (*Id.*) Plaintiffs also allege that PFCs have entered their real property. (*Id.*) Plaintiffs allege that they have suffered, or are at increased risk of suffering, from adverse health effects caused by PFC exposure. (*Id.*)

## II.    PROCEDURAL HISTORY

Plaintiffs propose to represent a class comprising the approximately 1,600 residents of Blades, as well as individuals outside of Blades that receive their drinking water from private wells that were contaminated with PFOA and PFOS from the Procino and Peninsula facilities. (*Id.* ¶ 145.)

Plaintiffs filed their original complaint on May 17, 2019, in Delaware Superior Court. *Banks v. E.I. DuPont de Nemours and Company, et al.*, No. S19C-05-024 ESB. Defendant 3M removed to this Court on September 6, 2019. (D.I. 1.) Plaintiffs filed a First Amended Complaint on February 7, 2020. (D.I. 44.) The FAC contains eight counts:

- Count I: negligence against Defendant Procino (*id.* ¶¶ 195–210);

- Count II: negligence against Defendants 3M, DuPont, Atotech, and MacDermid (*id.* ¶¶ 211–33);

- Count III: medical monitoring against all Defendants (*id.* ¶¶ 234–40);

- Count IV: breach of implied warranty against Defendants 3M, DuPont, Atotech, and MacDermid (*id.* ¶¶ 241–45);

- Count V: trespass against Defendants Procino and Blades Development (*id.* ¶¶ 246–60);

- Count VI: private nuisance against Defendants Procino and Blades Development (*id.* ¶¶ 261–67);

5

- Count VII: fraudulent concealment against Defendants 3M, DuPont, Atotech, and MacDermid (*id.* ¶¶ 268–79); and

- Count VIII: conspiracy against Defendants 3M, DuPont, Atotech, and MacDermid. (*Id.* ¶¶ 280–85).

The FAC also requests punitive damages.  (*Id.* ¶¶ 286–89.)  Defendant Procino answered the FAC. (D.I. 55.)  The remaining defendants (the "Moving Defendants") filed separate motions to dismiss for failure to state a claim.  (D.I. 65; D.I. 67; D.I. 69; D.I. 71; D.I. 81.)

While the motions to dismiss were pending, the Court had questions about the existence of subject matter jurisdiction.  In accordance with its independent duty to satisfy itself of its subject matter jurisdiction, the Court denied the motions to dismiss for failure to state a claim, without prejudice to renew, and requested supplemental briefing on subject matter jurisdiction.  (D.I. 86.) After receiving briefing and hearing argument, the Court concluded that it had subject matter jurisdiction and should exercise it.  *Banks v. E.I. DuPont de Nemours & Co.*, No. 19-1672-MN-JLH, 2021 WL 7209361 (D. Del. Dec. 2, 2021).

Subsequently, the Moving Defendants renewed their motions to dismiss for failure to state a claim.  (D.I. 106; D.I. 109; D.I. 110; D.I. 113; D.I. 115.)  This Report and Recommendation addresses all five pending motions.

## III.   LEGAL STANDARDS

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing

*Twombly*, 550 U.S. at 556).  A possibility of relief is not enough.  *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining the sufficiency of the complaint under the plausibility standard, all "well-pleaded facts" are assumed to be true, but legal conclusions are not.  *Id.* at 679.  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Twombly*, 550 U.S. at 558 (quotation omitted).

## IV.   DISCUSSION

Each Moving Defendant asks the Court to dismiss each claim asserted against it.  I take the counts in order.[4]

### A.   Count II: negligence against Defendants 3M, DuPont, Atotech, and MacDermid

Count II is a state law negligence claim against 3M, DuPont, Atotech, and MacDermid.  Plaintiffs allege, essentially, that 3M and DuPont (collectively, the "Manufacturer Defendants") sold PFOS and PFOA to Atotech and MacDermid (the "Supplier Defendants") and others, who in turn incorporated it into products supplied to Procino and Peninsula.  Procino and Peninsula used those PFOS- and PFOA-containing products in their plating operations and discharged PFOS- and PFOA-containing waste into the environment, where it made its way into the water supply.  The FAC alleges, among other things, that the Manufacturer and Supplier Defendants knew how PFOA- and PFOS-containing products would be used and stored at facilities like Procino and Peninsula and that it was foreseeable that the discharge of PFOS- and PFOA-containing waste

---

[4] Count I names only Defendant Procino.  Procino has not moved to dismiss.

would contaminate the environment and endanger individuals, like Plaintiffs, who lived in the area and consumed the drinking water.  (FAC ¶¶ 212–30.)  According to the FAC, the Manufacturer and Supplier Defendants "knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding environment, groundwater, and drinking water supplies" but they failed to notify the downstream users of their PFC-containing products "about the danger that PFOA and PFOS would enter the environment and groundwater." (FAC ¶¶ 219–20, 226.)

### 1.    Duty

The Manufacturer and Supplier Defendants make a number of arguments in support of dismissing the negligence claim, but their primary argument is that the FAC fails to plausibly allege that they owed a duty to Plaintiffs.  (D.I. 107 at 11; D.I. 111 at 7–10; D.I. 112 at 10–11; D.I. 114 at 5–7.)  I disagree.

The Delaware Supreme Court has adopted § 388 of the Restatement (Second) of Torts, which concerns the duty of a manufacturer to warn users of the dangerous nature of its products. *Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1261 (Del. 2018).  It provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (Am. Law Inst. 1965).  Importantly, it states that a manufacturer's duty extends not only to those who use its products "but also to third persons whom the supplier should expect to be endangered by [their] use," which may include persons who have no connection with the ownership or use of the product itself.  *Id.* at cmt. d; *Ramsey*, 189 A.3d at 1279.

Although the duty to warn imposed by § 388 might at first glance appear very broad, a manufacturer's ultimate duty is limited in several significant ways.  First, the manufacturer's duty is "dependent on whether it had knowledge of the hazard associated with its product."  *Ramsey*, 189 A.3d at 1279 (citation omitted).  Second, "liability is imposed only where the manufacturer had no reason to think that the users of its products would recognize the danger."  *Id.*  Third, the duty only extends to those whom the manufacturer "should expect . . . to be endangered" by the product's probable use, and the standard for determining the duty is only that which a reasonable person engaged in the manufacturer's activity would have done, taking into consideration the pertinent circumstances at the time.  *Id.*  Finally, Delaware common law recognizes a "sophisticated purchaser" defense that says that a manufacturer may satisfy its duty to warn under certain circumstances by relying on warnings and instructions it conveyed to a downstream purchaser—even where it might have been reasonable to warn a broader class of individuals.  *Id.*

Applying those principles, the Delaware Supreme Court recently held in *Ramsey* that an industrial plant employee's wife who alleged that her lung cancer was caused by regularly laundering her husband's asbestos-covered work clothes had a viable negligence claim against an asbestos manufacturer for failure to give warnings and safe laundering instructions.  The court held that the asbestos manufacturer was subject to liability to the wife even though she herself did not use the asbestos-containing products and had no connection to either the industrial plant or the

asbestos manufacturer.  The court pointed out, however, that the asbestos manufacturer could raise a sophisticated purchaser defense, under which it could not be held liable if it provided sufficient warnings and instructions to the husband's employer, who in turn could have warned the husband or his wife.  *Id*. at 1280.

Applying Restatement § 388 to the allegations here, I conclude that the FAC sets forth facts plausibly suggesting that the Manufacturer and Supplier Defendants are subject to liability to Plaintiffs for their alleged failure to warn about known dangers of PFOA and PFOS and to provide instructions for appropriate containment.  The FAC alleges facts making it plausible that the Manufacturer Defendants supplied PFOA and PFOS to the Supplier Defendants (and others), who incorporated those chemicals into products used for plating.  The FAC alleges facts making it plausible that the Manufacturer and Supplier Defendants knew both that the PFC-containing products they supplied would be used by a downstream purchaser for plating and that the use for which they were supplied would generate PFC-containing waste that would need to be disposed of.  It alleges facts suggesting that the Manufacturer and Supplier Defendants knew that, if not handled appropriately, PFC-containing waste could contaminate the local water supply and endanger the health of those who drank from it.  It alleges facts suggesting that the ultimate users (Procino and Peninsula) did not dispose of their PFC-containing waste in a way that kept it out of the water supply, resulting in high concentrations of PFCs in Blades' water supply, which makes it at least plausible that the Manufacturer or Supplier Defendants—or both—did not provide appropriate warnings and instructions to downstream users.  Those allegations are enough to move forward with a negligent failure to warn claim against the Manufacturer and Supplier Defendants.

The Manufacturer and Supplier Defendants argue that the *Ramsey* case is limited to its particular facts and that recognizing a duty under the facts alleged here would be expanding

Delaware law.  I disagree.  In *Ramsey*, the Delaware Supreme Court referred to Restatement § 388 as setting forth "settled principles."  *Ramsey*, 189 A.3d at 1284.  Nothing in the *Ramsey* opinion suggests that the Delaware Supreme Court would apply § 388 only to take-home asbestos cases.[5] Applying the Restatement here is not expanding the law; it is applying settled Delaware law to a new set of facts.[6]

3M cites *Brower v. Metal Industries, Inc.* for the proposition that it owes no duty to Plaintiffs because Peninsula and Procino disposed of PFOA and PFOS in a way that was obviously improper.  719 A.2d 941, 945–46 (Del. 1998) (holding that a window screen manufacturer "had no duty to persons who could be harmed by a screen improperly used for the unintended purpose of restraining infant children from falling out of an open window").  3M points out that the FAC

---

[5] In support of their assertion that *Ramsey* has no application outside of the take-home asbestos context, Defendants seize on this line from the Delaware Supreme Court's opinion: "We therefore overrule our prior cases, to the extent necessary, . . . and hold that a household member who regularly launders an employee's asbestos-covered clothing, like the plaintiff-spouse here, may sue her spouse's employer for its failure to provide warnings and safe laundering instructions." *Ramsey*, 189 A.2d at 1262.  Defendants take the "to the extent necessary" clause out of context to suggest that the Delaware Supreme Court will apply Restatement § 388 to a case only "to the extent" it is a take-home asbestos case.  I disagree.  That is not what the Court said, and nowhere in that opinion did the Court say or imply that it would only apply Restatement § 388 to take-home asbestos cases.  The cases that were overruled "to the extent necessary" by *Ramsey* were cases that had held that employers were not liable for their failure to warn employees' spouses about asbestos; the Court overruled them because it considered it unfair to hold manufacturers and suppliers liable under § 388 but to immunize their purchasers.

[6] Of course, Plaintiffs' negligence claim is governed by Delaware law, and it is not the place of a federal court to decide whether a state court should follow "emerging law."  *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 920 (3d Cir. 1982).  I note, however, that courts in other jurisdictions (applying different legal standards) have concluded that PFC manufacturers (including 3M and DuPont) and suppliers may be liable to individuals exposed to PFCs in the water supply.  *See, e.g.*, *Menkes v. 3M Company*, No. 17-0573, 2018 WL 2298620, at *3–5 (E.D. Penn. May 21, 2018) (applying Pennsylvania negligence law); *Andrick v. Saint-Gobain Performance Plastics Corp.*, No. 17-1058, 2018 WL 3068056 (N.D.N.Y. June 21, 2018) (applying New York strict products liability law); *Wickenden v. Saint-Gobain Performance Plastics Corp.*, 2018 WL 3069193, at *7 (N.D.N.Y. Jun. 21, 2018) (same).

alleges that Peninsula and Procino "carelessly discharged PFOA and PFOS into the environment." (D.I. 114 at 6 (citing FAC ¶ 2).)  But a "careless discharge" is not necessarily the same thing as an "obvious misuse."  Even if it were obvious in 2022 that PFOA- and PFOS-containing waste should not be directly discharged into the environment, the Court cannot at this stage and on this record make a finding about whether the same conduct was obviously improper decades ago.  One inference that might be drawn from the facts alleged is that the electroplating companies discharged their waste the way they did because the Manufacturer and Supplier Defendants did not provide appropriate warnings about the dangers of releasing PFOA and PFOS into the environment.  Moreover, it is possible—and, indeed, the FAC alleges—that PFOA and PFOS were discharged into the environment both during their intended use in the plating process as well as when the waste was disposed of.  (FAC ¶¶ 8, 96.)  3M is essentially saying that the electroplating companies' improper dumping must have been the only cause of the contamination in Blades.  But the Court must view the allegations in the light most favorable to Plaintiffs, and the Court cannot (at this stage and on this record) conclude that the contamination arose solely as a result of obviously improper conduct on the part of the electroplating companies.

The Manufacturer and Supplier Defendants contend that the negligence claim should be dismissed at this stage because imposing a duty under these circumstances would require them to provide warnings to persons they do not even know.  I'm not persuaded that Defendants are entitled to dismissal on that basis.  Delaware follows Restatement § 388, and it says that manufacturers and suppliers of chattel can be liable to persons they have no connection with.  In addition, the Manufacturer and Supplier Defendants may be entitled to invoke some form of the "sophisticated purchaser" defense, under which they could attempt to establish that their duties to warn were

discharged because they conveyed warnings and handling instructions to a downstream purchaser.[7] *See Ramsey*, 189 A.3d at 1281 n.131.

### 2. Causation

Each of the Manufacturer and Supplier Defendants contends that the FAC fails to plausibly allege that one of its products contributed to the PFC pollution in Blades' water supplies. I disagree. As for the Supplier Defendants, the FAC alleges, for example, that Atotech manufactured PFC-containing Fumetrol-140, that MacDermid sold PFC-containing Barrett Snap, both of which were used by Peninsula, which operated in Blades from 1993 to 1995. As for the Manufacturer Defendants, although the FAC's allegations are not the most detailed, Plaintiffs allege enough for each Defendant to understand what they are accused of doing—selling PFC-

---

[7] Although *Ramsey* only dealt with the case of an employer who could have warned employees and their spouses, it cited an influential law review article that applied the same reasoning to also argue that the sellers of industrial supplies and equipment should only have a duty to warn the purchasers who bought directly from them. *Ramsey*, 189 A.3d at 1281 n.131 (citing Victor E. Schwartz & Russell W. Driver, *Warnings in the Workplace: The Need for a Synthesis of Law and Communication Theory*, 52 U. Cin. L. Rev. 38 (1983)). Some of the Defendants suggest that they did provide adequate warnings to downstream purchasers. But what Defendants said to whom and when is a factual matter inappropriate for resolution at the motion to dismiss stage. Given that there are high levels of PFCs in the water supplies in Blades, it is at least plausible that they didn't.

In a related argument, MacDermid contends that it cannot be liable under Restatement § 388 because "Plaintiffs plead that Procino (and presumably Peninsula) 'knew or should have known' that 'exposure to PFC-Containing Products was hazardous to the environment and human health.' FAC ¶¶ 196–197, 200 (emphasis added)." (D.I. 111 at 10.) In other words, MacDermid contends that it had no duty to warn downstream purchasers like Procino and Peninsula because one of those purchasers (Procino) already knew that PFOA and PFOS are dangerous if handled improperly. I reject that argument. It is true that a supplier does not have a duty to warn under § 388 if it provides a product to a purchaser "whom the supplier knows or reasonably believes is aware of th[e] danger." *Ramsey*, 189 A.3d at 1274 (quoting *In re Asbestos Litig.* (*Mergenthaler*), 542 A.2d 1205, 1212 (Del. Super. Ct. 1986)). But Plaintiffs here do not allege that MacDermid knew or reasonably believed that Procino knew about the dangers of PFOA and PFOS. And while it is possible that a jury will find that negligence on the part of Procino was the only proximate cause of Plaintiffs' injuries, the court cannot make that determination at this stage.

containing products without sufficient warnings and instructions that ultimately ended up at Procino and Peninsula—and to mount a defense.

The Manufacturer and Supplier Defendants cite asbestos cases for the proposition that toxic tort plaintiffs are required to be more specific about the products at issue and the time frame of exposure. *See, e.g., Baldonado v. Arvinmeritor, Inc.*, No. 13-833-SLR-CJB, 2014 WL 2116112, at *4–6 (D. Del. May 20, 2014), *adopted*, 2014 WL 2621119 (June 10, 2014); *In re Benzene Litig.*, No. 05C-09-020-JRS (BEN), 2007 WL 625054, at *1, *7 (Del. Super. Ct. Feb. 26, 2007). As *In re Benzene Litigation* recognized, requiring a plaintiff to identify a product or premises at issue and the time and place of the exposure serves several important purposes, including helping a defendant figure out if the defendant sold an implicated product and in what form the plaintiff encountered it. *In re Benzene Litig.*, 2007 WL 625054, at *7. While an asbestos plaintiff may not always remember the precise circumstances surrounding his potential exposure, he has some reason to believe that he was exposed to asbestos, and requiring him to plead that information "will begin to draw a picture from which the defendants can ascertain which of their products are involved in the litigation." *Id.* at *8. However, those cases also recognize that a defendant's interest in specific factual allegations must be balanced against the difficulties facing a plaintiff who may not remember where and when his exposure to asbestos occurred.[8] *Id.* at *3.

_____

[8] To the extent that Defendants rely on asbestos cases from the Delaware Superior Court, I note that, unlike the Federal Rules of Civil Procedure, Superior Court Rule 9(b) requires negligence claims to be pleaded with particularity. While this Report and Recommendation acknowledges cases like *In re Benzene Litigation* and the policy reasons for requiring certain allegations in toxic tort cases, none of the Moving Defendants have suggested that the Superior Court rules govern this Court's review of the adequacy of the allegations in the FAC. *See Baldonado v. Arvinmeritor, Inc.*, 2014 WL 2116112, at *3 ("Once a case is removed to the United States district courts, . . . the Federal Rules of Civil Procedure govern the pleading requirements for a plaintiff's complaint.").

Plaintiffs here, unlike most asbestos plaintiffs, were not directly exposed to dangerous products at their place of employment. Rather, Plaintiffs allege that they were exposed to elevated levels of PFCs in their drinking water. The Manufacturer and Supplier Defendants do not explain how, at this stage of the case, Plaintiffs could narrow down the time frame of their exposure to elevated PFCs, which allegedly occurred over a period of years, or even how narrowing the time frame of their exposure would be helpful to Defendants in understanding what they are accused of doing (as Defendants may have engaged in the accused conduct decades before the exposure). Nor is it apparent how Plaintiffs could figure out more details about the PFC-containing products at issue without the benefit of discovery.

Plaintiffs have identified products and classes of products (PFC-containing mist and fume suppressants, fluorosurfactants, wetting agents and emulsifiers, including Fumetrol-140 manufactured by Atotech, Barrett Snap manufactured by MacDermid, and cadmium fluoroborate), how they were used (*e.g.*, in plating processes), the companies that used them (Procino and Peninsula), where those companies were located (Blades), when those companies operated (1985 to the present and from 1993 to 1995, respectively), and when Plaintiffs quit drinking from the contaminated water supply (2018). That is enough to move forward at this stage, and Defendants have not persuasively explained how Plaintiffs could plead any more detail than they already have.[9]

---

[9] I'll briefly address the remaining arguments made by some of the Manufacturer and Supplier Defendants. 3M suggests that the negligence claim against it should be dismissed because, unlike the allegations against the other Manufacturer and Supplier Defendants, the FAC does not "link 3M on an individual-defendant basis to any of the particular PFC-containing products that Procino and Peninsula allegedly used." (D.I. 128 at 1; *see also* D.I. 114 at 3 ("Plaintiffs nowhere say that 3M, as opposed to other Defendants or manufacturers, actually supplied the PFOA and PFOS in the particular PFC-Containing Products that Procino and Peninsula allegedly used.").) On the contrary, Plaintiffs pleaded that "[u]pon information and belief, PFOS and PFOA manufactured by 3M . . . was used in the productions of . . . Fumetrol-

Whether Plaintiffs will ultimately be able to prove that a particular Manufacturer or Supplier sold a PFC-product that was used in Blades and that its product in fact contributed to the PFC contamination discovered in 2018, I do not know.  Only time will tell.  All I can say at this

---

140, Barret Snap and cadmium fluoroborate" and "the PFC-Containing Products used in the hard chrome plating and nonstick cookware manufacturing processes conducted by Peninsula and Procino [in Blades] were manufactured, distributed, and supplied by 3M, DuPont, Atotech, and MacDermid."  (FAC ¶¶ 19, 131.)  That makes this case at least somewhat different from the non-binding authority cited by 3M.  *See, e.g., Barnstable County v. 3M Co.*, No. 17-40002, 2017 WL 6452245 (D. Mass. Dec. 18, 2017) (dismissing complaint that alleged that any of up to 54 defendants could have provided the contaminating chemicals); *Baldonado v. Arvinmeritor, Inc.*, 2014 WL 2116112, at *1 (dismissing complaint that alleged that any of 34 defendants could have sold the injurious asbestos).  However, even if I discounted those allegations, I don't think it would render the claim against 3M implausible.  True, the FAC alleges that there were other companies besides 3M and DuPont that manufactured PFOA and PFOS, but the record does not suggest that there were so many such companies that it is implausible to think that PFOA from 3M made its way to a facility in Blades at some point between 1983 and 2000.  Indeed, the FAC suggests that DuPont started making PFOA in 2000 because 3M quit, plausibly suggesting that there may not have been another significant PFOA supplier at that time.  Of course, if discovery reveals that none of 3M's PFC-containing products were used in Blades, 3M is free to move for summary judgment at an appropriate time.

Atotech argues that any claims against it seeking damages for property damage or diminution of property value should be dismissed because the FAC fails to sufficiently allege such damages.  (D.I. 112 at 7–8.)  I cannot tell from the FAC if Plaintiffs are attempting to recover property-related damages on their negligence claim (and such damages may not be recoverable under the law).  *See* Restatement § 388 (permitting recovery for "physical injury").  However, at least some of the named Plaintiffs have alleged damages in the form of present illness caused by PFC exposure.  So any failure of the FAC to adequately allege property damage would not be a reason to dismiss the negligence claim against Atotech entirely (although it might have been a reason to dismiss claims asserted by certain named Plaintiffs).

MacDermid also contends that the FAC fails to plausibly allege proximate cause because it does not specifically allege that Procino failed to store Barrett Snap properly or that MacDermid had anything to do with Procino's environmental violations.  (D.I. 111 at 7.)  Those arguments miss the mark.  As explained above, the FAC alleges that Barrett Snap contains PFCs, that Procino used Barrett Snap, and that samples collected from Procino wells in 2018 contained PFC concentrations more than 40 times the Health Advisory Level.  That is enough to plausibly suggest that PFCs from Barrett Snap made their way into the groundwater.  Whether the use of Barrett Snap in fact contributed to the PFC contamination, and whether such contamination was caused by MacDermid's failure to warn, Procino's discharge of wastewater, or both, are questions of fact not appropriate for resolution at this stage.

16

stage is that Count II states a plausible negligence claim against each of the Manufacturer and Supplier Defendants.

### B.    Count III: medical monitoring against all Defendants

Count III of the FAC alleges a medical monitoring claim as an independent cause of action, not merely as a remedy for negligence or some other tortious conduct.  The Moving Defendants say that Count III should be dismissed because Delaware does not recognize a claim for medical monitoring.  I agree.

The idea behind the non-traditional tort of medical monitoring is to allow a plaintiff who has an increased risk of disease resulting from his exposure to toxic substances to obtain compensation for the costs of medical surveillance, even though the plaintiff has not yet developed physical symptoms. The Delaware Supreme Court has never recognized medical monitoring as a free-standing tort.  And there is no reason to think it would.  A tort claim requires an injury.  In Delaware, an increased risk of illness (without a present physical injury), is not a sufficient injury. *Baker v. Croda Inc.*, No. 20-1108-SB, 2021 WL 7209363, at *1–2 (D. Del. Nov. 23, 2021) (dismissing medical monitoring claim because plaintiffs "cannot recover damages for the risk of diseases that they do not yet have"); *see also United States v. Anderson*, 669 A.2d 73, 77 (Del. 1995) (suggesting, in dicta, that "[t]he requirement of a preceding physical injury prohibits plaintiffs from claiming that exposure to toxic substances, for instance, has created an increased risk of harm not yet manifested in a physical disease").  None of the cases cited by Plaintiffs are to the contrary.

To be sure, if a plaintiff has a physical injury resulting from a tort committed by a defendant, the plaintiff may also seek to recover for "increased risk" as an element of his damages. *Anderson*, 669 A.2d at 78 (holding that plaintiffs bringing medical negligence claims could recover for increased risk when the risk was tied to a physical injury).  But Count III poses medical

monitoring as a standalone claim, and medical monitoring is not a tort in Delaware.  This Court cannot invent new state law claims.  Count III should be dismissed.

### C.      Count IV: breach of implied warranty against Defendants 3M, DuPont, Atotech, and MacDermid

Count IV is a breach of implied warranty claim against the Manufacturer and Supplier Defendants.  They argue, among other things, that the warranty claim (as currently pleaded) is barred by the statute of limitations.  I agree.[10]

Delaware has adopted a version of the Uniform Commercial Code.  Plaintiffs' breach of implied warranty claim arises under 6 Del. C. § 2-318.  That section provides that "[a] seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." 6 Del. C. § 2-318.   In cases alleging breach of implied warranty, the statute of limitations set forth in 6 Del. C. § 2-725 applies, even if the breach resulted in a personal injury. *Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154, 158 (Del. 1980).  Section 2-725(1) provides that "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."  6 Del. C. § 2-725.  Section 2-725(2) provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach" and that "[a] breach of warranty occurs when tender of delivery is made."  6 Del. C. § 2-725(2).

Plaintiffs filed this action on May 17, 2019.  Accordingly, Plaintiffs can only proceed on an implied warranty claim against a particular Defendant if that Defendant tendered delivery of a

---

[10] In the Third Circuit, a statute of limitations defense may be raised under Rule 12(b)(6) "if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Robinson v. Johnson,* 313 F.3d 128, 134–35 (3d Cir. 2002)).

PFC-containing product after May 17, 2015, and PFCs from that product subsequently entered the environment in Blades and injured Plaintiffs.[11]  But nothing in the FAC suggests that any PFC-containing products attributable to the Manufacturer and Supplier Defendants were delivered to the Procino or Peninsula facilities in Blades after May 17, 2015 and subsequently discharged into the environment.

According to the FAC, Peninsula ceased its electroplating operations in 1995.  (FAC ¶ 130.)  Thus, Plaintiffs can't have an in-statute breach of warranty claim against the Manufacturer and Supplier Defendants based on the sale of PFC-containing products that ended up at Peninsula.

As for Procino, the FAC alleges that Defendant 3M stopped making PFOA and PFOS in 2000, which makes it implausible that 3M tendered delivery after May 17, 2015, of a PFOA- or PFOS-containing product that ultimately ended up at Procino.  The FAC alleges that Procino used Defendant Atotech's Fumetrol-140 and Defendant MacDermid's Barrett Snap in 2007 and that Procino mishandled its wastewater between December 2007 and May 2010.  (FAC ¶¶ 127–28.)  But the FAC does not allege that Procino has used either of those chemicals since 2007, much less used them in such a way that resulted in the discharge of PFCs into the environment.  Indeed, the FAC does not allege that Procino used any PFC-containing products tendered after May 17, 2015.  The FAC's use of the past tense to describe Procino's use of PFC-containing products, combined with the absence of any particular facts suggesting a use of PFC-containing products that contributed to PFC discharges at any point after 2010, does not suggest that there was any tender

---

[11] Some of the Defendants were added to the case after the original pleading, but it is not necessary to wade through any relation-back issues because, as explained below, the FAC does not suggest any actionable tender of delivery by any Defendant after May 17, 2015, four years prior to the original pleading.

of delivery of a PFC-containing product after May 17, 2015, that resulted in discharge of PFCs into the environment.

Plaintiffs point out that the FAC alleges that the Procino facility is still operating.  But that doesn't indicate when the Manufacturer and Supplier Defendants tendered delivery of any PFC-containing products.  Plaintiffs do not suggest that the mere fact the Procino facility continued to operate after May 17, 2015, supports an inference that it used any PFC-containing products that were tendered by Defendants after that date, much less an inference that the Procino facility subsequently discharged PFCs from those products into the environment.

Plaintiffs also contend that the statute of limitations should be tolled because of "fraudulent concealment" on the part of the Manufacturer and Supplier Defendants.  I reject that argument. The four-year limitations period governing breach of implied warranty claims begins running at the time the goods are delivered "regardless of the aggrieved party's lack of knowledge of the breach."  6 Del. Code § 2-715.  In other words, the statute itself makes clear that it doesn't matter for purposes of the limitations period that Plaintiffs lacked knowledge of the breach, whether because of Defendants' fraudulent concealment or otherwise.[12]  *Cf. The Knit With v. Knitting Fever, Inc.*, 625 F. App'x 27, 34 (3d Cir. 2015) (holding that fraudulent concealment cannot toll the Pennsylvania UCC limitations period for the same reason).

---

[12] In support of their tolling argument, Plaintiffs cite *Lima Delta Co. v. Gulfstream Aerospace Corp.*, No. N14C-02-042 MMJ, 2019 WL 624589, at *4 (Del. Super. Ct. Feb. 13, 2019). That case appeared to assume that tolling was available, but it ultimately rejected the plaintiffs' tolling argument because their allegations of concealment "fail[ed] for lack of particularity."  *Id.* Of course, a plaintiff is generally not required to plead facts to negate a defendant's affirmative defense.  But I do note that, even if the Delaware Supreme Court were to hold that fraudulent concealment tolls the limitations period in 6 Del. C. § 2-715, the FAC fails to allege fraudulent concealment.  *See* Section IV.E, *infra*.

If Plaintiffs have a good-faith basis to believe that any Manufacturer or Supplier Defendant tendered a PFC-containing product after May 17, 2015, and that Procino's subsequent use or disposal of waste from that product contributed to the contamination in Blades and injured Plaintiffs, they may amend their pleadings to allege facts supporting that belief.  As currently pleaded, Plaintiffs' warranty claim is barred by the statute of limitations.  Count IV should be dismissed.

### D.     Counts V and VI: trespass and private nuisance against Defendants Procino and Blades Development

Counts V and VI are trespass and private nuisance claims against Defendants Procino and Blades Development.  Procino answered.  Blades Development moved to dismiss both counts for failure to state a claim.

Blades Development says that it purchased the former Peninsula site as a "Brownfield Developer,"[13] and that it entered into a "Brownfields Development Agreement" ("BDA") with DNREC in 2006 that Blades Development contends immunizes it from liability to private parties for trespass and nuisance arising from the site.  Blades Development attached a copy of the BDA and other public documents to its briefing.  (D.I. 129, Exs. A–C.)   According to Blades Development,

> The purpose of the BDA was to set forth a scope and schedule of activities to assess and respond to the actual, threatened, or perceived release of hazardous substances at the Peninsula site, and settle and resolve the potential liability of Blades Development, LLC, for the existing environmental conditions that might otherwise result pursuant to the Delaware Hazardous Substances Cleanup Act ("DHSCA") after Blades Development, LLC, became the owner of

---

[13]  According to the EPA's website, "[a] brownfield is a property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant."  *Overview of EPA's Brownfields Program*, EPA, https://www.epa.gov/brownfields/overview-epas-brownfields-program (last visited July 31, 2022).

> the Peninsula site.  Furthermore, the parties intended that by entering
> into the BDA, Blades Development, LLC, as a Brownfield
> Developer, would be afforded the liability protection set forth in 7
> Del. C. § 9125.

(D.I. 116 at 4–5.)  Blades Development says that, in accordance with the BDA, DNREC reviewed the results of environmental sampling conducted at the site (which the EPA had at least partially cleaned up in 1995), evaluated Blades Development's proposed development plan, and agreed in 2007 that no additional action needed to be taken to clean up the site.  Blades Development also points out that DNREC subsequently issued a "Certification of Completion of Remedy" that recognized Blades Development's compliance with the development plan.  (D.I. 129, Ex. C.) According to Blades Development, the foregoing sequence of events resulted in it being immunized from tort liability under 7 Del. C. § 9125.

Section 9125 is located in a subchapter of the Delaware Hazardous Substance Cleanup Act (DHSCA), and it provides that "[n]otwithstanding § 9105 of [Title 7], a brownfields developer who enters into a Brownfields Development Agreement with the Secretary is not liable with respect to the facility that is the subject of the Brownfields Development Agreement for any release or imminent threat of release of hazardous substances existing at the time the Brownfields Development Agreement is entered into, or for a remedy, or for any costs incurred by the State or any other person related to a remedy, for such a release or imminent threat of release at a facility" if the developer acts in accordance with the DNREC-approved development plan.  7 Del. C. § 9125(a).  Section 9105 sets forth the "Standard of Liability" of property owners for violations of the DHSCA, and it says that the "Secretary" can recover costs and damages "associated with a release from a facility and for all natural resource damages resulting from the release."  7 Del. C. § 9105(a), (b).

Plaintiffs do not appear to dispute Blades Development's contention that the Court may consider the BDA and related documents.  Plaintiffs do dispute that 7 Del. C. § 9125 can immunize a Brownfields Developer from tort liability to private parties resulting from the developer's ownership and use of its land.

Plaintiffs' point is well taken.  The texts of §§ 9105 and 9125, and their placement in the DHSCA, suggest that the immunity provided by § 9125 might be limited to immunity from liability for claims arising under the DHSCA.  Blades Development cites no case to the contrary.  Nor has Blades Development argued that the DHSCA preempts common law actions for trespass and nuisance.

One might question whether Plaintiffs are likely to prevail against Blades Development given that DNREC apparently thought in 2007 that the Peninsula site required no further cleanup action.  But it is not the role of the Court to assess likelihood of success at the motion to dismiss stage.  All I can say now is that Blades Development has not persuaded me that it is immune from liability to Plaintiffs under 7 Del. C. § 9125.  Blades Development is free to reraise its arguments against liability—and to cite evidence in support of its arguments—at the appropriate time in a later stage of the case.  I recommend that Blades Development's request to dismiss Counts V and VI be denied.

### E.   Count VII: fraudulent concealment against Defendants 3M, DuPont, Atotech, and MacDermid

Count VII alleges fraudulent concealment by the Manufacturer and Supplier Defendants. Defendants argue, among other things, that the FAC fails to allege fraudulent concealment with sufficient particularity.  I wholly agree.

"To state a claim for fraudulent concealment, a plaintiff must plead facts showing that: (1) the defendant deliberately concealed a material fact or remained silent in the face of a duty to

speak, (2) the defendant acted with scienter, (3) the defendant had an intent to induce plaintiff's reliance upon the concealment, (4) causation, and (5) plaintiff suffered damages resulting from the concealment." *Vatidis v. Trimble, Inc.*, No. 18-998-MN, 2019 WL 3546693, at *4 (D. Del. Aug. 5, 2019) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).   A claim for fraudulent concealment must be pleaded with particularity, in accordance with Federal Rule of Civil Procedure 9(b).  *Id.*  That means that the plaintiff "must plead his claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged."  *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quotation omitted).  "A complaint is deficient for the purposes of Rule 9(b) when it relies on . . . 'puzzle' pleading."  *Vatidis*, 2019 WL 3546693, at *4 (quoting *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007)).

Plaintiffs' FAC is a classic example of puzzle pleading.  It names a lot of Defendants.  It has a lot of allegations.  It says that certain Defendants knew and concealed certain facts from the public about the dangers of PFCs.  It says that Plaintiffs did not know that their drinking water was contaminated and that they suffered damages as a result.  What the FAC does *not* do, however, is put together the facts supporting their fraudulent concealment claim in a way that a reader can understand what Plaintiffs' theory of fraudulent concealment is.  In order to assess the claim, the Court needs to understand (at a minimum) *for each named Defendant*: what particular material fact did the Defendant conceal or remain silent about; why did that Defendant have a duty to speak about that particular fact to Plaintiffs at a particular time; what reliance by Plaintiffs did the Defendant induce; why is it plausible to think that the Defendant's silence was intended to induce reliance by Plaintiffs; what damages were caused by the concealment of the material fact; and how did the Defendant's concealment of the fact cause those damages.  The FAC leaves to the

Defendants and the Court the burden of trying to match up a particular Defendant and a particular concealed fact with the rest of the elements.   It fails to put the Defendants on notice of what the alleged misconduct is and is therefore insufficient.

Plaintiffs' briefs do not clear things up.  As just one example, Plaintiffs suggest that they relied on an assumption that their drinking water was free of PFCs, which suggests that Plaintiffs' theory is that the Defendants materially concealed the fact that the water supplies in Blades were contaminated, but the FAC contains no allegations suggesting that any of the Manufacturer and Supplier Defendants knew that the water in Blades contained elevated PFC concentrations.

I do not know if Plaintiffs could ever make out a fraudulent concealment claim on these facts.  All I can say now is that the fraudulent concealment claim in Count VII is insufficiently pleaded and should therefore be dismissed.

## F.   Count VIII: conspiracy against Defendants 3M, DuPont, Atotech, and MacDermid

Count VIII is a conspiracy count against the Manufacturer and Supplier Defendants.  They say the conspiracy count should be dismissed because the FAC fails to allege a predicate intentional tort.  Plaintiffs' sole response is this: "Because Plaintiffs have adequately pled causes of action for fraudulent concealment, breach of implied warranty, and medical monitoring, their civil conspiracy claims likewise survive."  (D.I. 119 at 20; *see also* D.I. 120 at 19; D.I. 122 at 13; D.I. 123 at 19.)

As explained above, the FAC does not plead a fraudulent concealment, breach of warranty, or medical monitoring claim.  Plaintiffs have offered no other argument in support of maintaining Count VIII, so I recommend that it be dismissed.

### G.     Punitive damages

The FAC contains a demand for punitive damages.  (FAC ¶¶ 286–98.)  Some Defendants point out that punitive damages is not a standalone claim.  Plaintiffs respond that they are not asserting punitive damages as a standalone claim.  Defendants have not moved to strike the demand for punitive damages, so it will remain in the FAC.  If there is no basis to recover punitive damages against a particular Defendant, that Defendant can ask for summary judgment (or other relief) at the appropriate time.

## V.     CONCLUSION

In sum, I RECOMMEND the following:

1.     DuPont's motion to dismiss (D.I. 106) should be GRANTED with respect to Counts III, IV, VII, and VIII and DENIED with respect to Count II.

2.     MacDermid's motion to dismiss (D.I. 109) should be GRANTED with respect to Counts III, IV, VII, and VIII and DENIED with respect to Count II.

3.     Atotech's motion to dismiss (D.I. 110) should be GRANTED with respect to Counts III, IV, VII, and VIII and DENIED with respect to Count II.

4.     3M's motion to dismiss (D.I. 113) should be GRANTED with respect to Counts III, IV, VII, and VIII and DENIED with respect to Count II.

5.     Blades Development's motion to dismiss (D.I. 115) should be GRANTED with respect to Count III and DENIED with respect to Counts V and VI.

Plaintiffs have requested leave to amend their pleading to address any deficiencies.  I recommend that all dismissals be without prejudice and that Plaintiffs be granted leave to amend to address the identified deficiencies within 21 days.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),(C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1.  Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages.  Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: August 4, 2022

_____
The Honorable Jennifer L. Hall
United States Magistrate Judge